598 F.2d 1273
 101 L.R.R.M. (BNA) 2406, 86 Lab.Cas. P 11,296
 UNITED STEELWORKERS OF AMERICA, AFL-CIO and James Garry,
Quinto Delissio, Patrick McGhen and Ernest A.
Oblack, on behalf of themselves and
others similarly situated, Appellees,
v.
FORT PITT STEEL CASTING, DIVISION OF CONVAL-PENN, INC.,
DIVISION OF CONVAL CORPORATION, Appellant.
 Nos. 78-2035, 78-2654 and 79-1019.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 21, 1979.
Decided April 30, 1979.
 
 Rudolph L. Milasich, Jr. (argued), Carl B. Frankel, Pittsburgh, Pa., Bernard Kleiman, Chicago, Ill., for appellees.
 Henry J. Wallace, Jr. (argued), Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellant.
 Before HUNTER and WEIS, Circuit Judges, and STAPLETON,* District Judge.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 These three consolidated appeals result from a longstanding labor dispute between Fort Pitt Steel Casting (Fort Pitt, or the Company) and the United Steelworkers of America (Steelworkers, or the Union). The Steelworkers are the exclusive bargaining agent for over 300 Fort Pitt employees at the Company's plant in McKeesport, Pennsylvania. On June 23, 1978, the district court enjoined Fort Pitt from terminating premium payments necessary to keep its employees' hospital and insurance benefits in effect during a labor dispute[1] (No. 78-2035). Subsequently, on November 9, 1978, the district court held Fort Pitt in civil contempt for stopping the premium payments in violation of the injunction (No. 78-2654). Finally, on December 18, 1978, the court denied Fort Pitt's motion to vacate the injunction[2] (No. 79-1019). We affirm the district court's orders in Nos. 78-2035 and 78-2654. However, in No. 79-1019, although we reject Fort Pitt's claim that the injunction be vacated immediately, we remand to the district court to determine whether the Company has permanently terminated all operations at the plant. If the court finds it has done so, then the injunction must be dissolved.
 
 
 2
 * FACTS
 
 
 3
 Fort Pitt and the Steelworkers executed a three year collective bargaining Agreement (Agreement) on March 3, 1975. Section 9 of the Agreement is entitled "Adjustment of Grievances." That section provides that the grievance procedures agreed upon by the parties culminate, if necessary, in binding arbitration,[3] that they apply to "(a)ny (employee) request or complaint,"[4] and that "(t)he grievance procedure may be utilized by the Company in processing Company grievances."[5] Section 19 is entitled "Prior Agreements." Paragraph 140 of that section provides:
 
 
 4
 The parties agree that in the event of a labor dispute at the end of termination of this Agreement, The Company will continue hospitalization and insurance benefits. At the end of said dispute, The Company will be reimbursed for payments made on behalf of the employees in payment methods mutually agreed on by the parties.
 
 
 5
 On March 3, 1978, the Agreement having expired and the parties having failed to reach a new contract, the Steelworkers began a lawful work stoppage. Pursuant to paragraph 140 of the 1975 agreement, Fort Pitt continued hospitalization and insurance coverage for its striking employees. As the strike continued, the parties engaged in negotiations for a new contract. In the course of those negotiations, the union denied that it was obligated by paragraph 140 to reimburse Fort Pitt for the benefit payments advanced by the Company during the work stoppage.[6]
 
 
 6
 The Company considered the Union's refusal to commit itself to reimbursement to be in breach of paragraph 140. As a result, in a letter to the Union dated May 16, 1978, Fort Pitt threatened to discontinue making premium payments unless by June 1, 1978, the Union guaranteed in writing to provide repayment.
 
 
 7
 The Steelworkers declined to furnish the assurances sought by Fort Pitt and, in order to prevent the Company from carrying out its threat, sought injunctive relief in the Court of Common Pleas of Allegheny County.[7] The case was removed to the United States District Court for the Western District of Pennsylvania and, on June 7, 1978, the court entered a preliminary injunction barring Fort Pitt from:
 
 
 8
 Failing to advance and to pay, in a timely manner, the premiums necessary to keep (Fort Pitt employees') hospitalization and insurance policies in effect.
 
 
 9
 On June 23, 1978, the district court issued an opinion and amended order maintaining the preliminary injunction.[8] 452 F.Supp. 886. The court held that whether the Steelworkers were required by paragraph 140 to guarantee reimbursement was an arbitrable issue and that by threatening to cut off premium payments, instead of seeking arbitration, the Company was engaging in "self-help." Because the court found that the Company's self-help remedy tended to undermine the integrity of the arbitral process, and because it concluded that the union members were in danger of immediate and irreparable injury, the court held that a preliminary injunction prohibiting the Company from terminating payments was both lawful and appropriate under the doctrine of Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).[9]
 
 
 10
 Fort Pitt initially complied with the preliminary injunction and negotiations for a new contract proceeded. Fort Pitt did not, however, seek to grieve the Union's alleged breach of the Agreement. On June 30, the Company proposed that paragraph 140 be changed so that the Company would make premium payments only during the first 30 days of a work stoppage.[10] The Union rejected this proposal. On September 13, the Company submitted a modified proposal which gave the Company the sole right to terminate contributions after the 30 day period had expired.[11] This proposal, too, was promptly rebuffed.
 
 
 11
 Concluding that the parties had bargained to an impasse regarding paragraph 140, the Company unilaterally implemented its September 13 proposal. On October 16, it notified its employees by letter that because more than 30 days had elapsed since the new paragraph 140 had been implemented, it was exercising its right under the new provision to terminate the payments. The Steelworkers subsequently filed a "Motion for Adjudication of Civil Contempt" in the district court. In granting the motion, the court recognized that management is ordinarily entitled to implement its own proposals once an impasse is reached, but concluded that because of the "unique" nature of the old paragraph 140, "the Company ha(d) in effect bargained away its right to institute a unilateral change in this clause following an impasse."
 
 
 12
 On November 10, with the work stoppage continuing, the Company made a "last and final offer" for a new Agreement. This offer was rejected and on November 29, the Company announced that it was totally and permanently closing the plant effective November 30, 1978. Fort Pitt subsequently moved to vacate the June 7 and June 23 orders, contending that its obligation under paragraph 140 ended with the shut-down of the plant. At a hearing before the district court, the Company claimed that no future production of any kind was planned, that steps were being taken to cancel orders already accepted, and that service by various public utilities at the plant was being cancelled.
 
 
 13
 The Steelworkers argued that "recent experience" suggested that the Company's announcement was merely a ruse designed to avoid its obligations under paragraph 140. The Union also contended that production work was being performed after November 30 by supervisory personnel who crossed the picket lines at the plant, and that this work would take three to four months to finish.
 
 
 14
 The district court found that despite the Union's reservations, Fort Pitt did intend "to close the plant once 'winding down' operations are completed." Nevertheless, the court refused to vacate the injunction. Relying on Nolde Bros. v. Local 358, Bakery Workers, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), it ruled that whether Fort Pitt's "obligations under Paragraph 140 terminated upon shutdown of its plant is an arbitrable issue," and that until the issue was resolved, the Company had no grounds to justify vacating the injunction.II
 
 DISCUSSION
 A. No. 78-2035
 
 15
 The Norris-LaGuardia Act, 29 U.S.C. §§ 101-115 (1976), limits the jurisdiction of federal courts to issue injunctive relief in cases involving labor disputes. Section 4(c) of that Act[12] provides:
 
 
 16
 No court of the United States shall have jurisdiction to issue any . . . temporary or permanent injunction In any case involving or growing out of any labor dispute To prohibit any person or persons . . . from . . .
 
 
 17
 (c) Paying or giving to, or Withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value.
 
 
 18
 The Company claims that in terminating premium payments, it was "withholding . . . other monies or things of value" from participants in a labor dispute. As a result, it asserts that the June 7 and June 23 injunctions were prohibited by section 4(c). The Steelworkers argue, however, that the injunction was valid under the Boys Markets exception to the Norris-LaGuardia Act.
 
 
 19
 Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), involved the question whether section 4(a) of the Norris-LaGuardia Act[13] deprived a federal court of jurisdiction[14] to enjoin a strike in breach of a no-strike/compulsory arbitration provision in a collective bargaining agreement. The Supreme Court found that unless federal courts were permitted to grant injunctions forbidding unions from striking, unions would be free to ignore the compulsory arbitration clauses of their agreements. Id. at 248-49, 90 S.Ct. 1583. This, in the Court's view, would seriously damage "the congressional policy to promote the peaceful settlement of labor disputes through arbitration." Id. at 241, 90 S.Ct. at 1587.[15] Thus, the Court held that the "core purpose" of the Norris-LaGuardia Act "to foster the growth and viability of labor organizations," Id. at 252, 90 S.Ct. at 1593 "is not sacrificed by the limited use of equitable remedies to further" the federal policy in favor of arbitration. Id. at 253, 90 S.Ct. at 1594.
 
 
 20
 We agree with the Steelworkers that the Boys Markets exception to the Norris-LaGuardia Act applies in this case and, therefore, that the district court's June 7 and June 23 injunctions were proper. We begin by noting that, although the Supreme Court in Boys Markets enjoined a strike by a union, injunctions may in certain circumstances issue against acts taken or threatened by the employer. See United States Steel Corp. v. United Mine Workers, 534 F.2d 1063, 1077 (3d Cir. 1976). In determining whether such an injunction is appropriate, we must examine: 1) whether the underlying dispute is subject to mandatory arbitration, See Buffalo Forge Co. v. United Steelworkers, 428 U.S 397, 407-08, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); Latrobe Steel Co. v. United Steelworkers, 545 F.2d 1336, 1341 (3d Cir. 1976); 2) whether the employer, rather than seeking arbitration of his grievance, is "interfer(ing) with and frustrat(ing) the arbitral processes . . . which the parties had chosen," Buffalo Forge, 428 U.S. at 407, 96 S.Ct. 3141, 49 L.Ed.2d 1022; and 3) and whether an injunction would be appropriate "under ordinary principles of equity." Boys Markets, 398 U.S. at 254, 90 S.Ct. at 1594, Quoting Sinclair Refining Co. v. Atkinson, 370 U.S 195, 228, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962) (Brennan, J., dissenting).
 
 
 21
 That the dispute which led to Fort Pitt's threat to terminate premium payments whether the Union was obligated to reimburse the Company for health and insurance plan contributions made during the strike was covered by the Agreement's arbitration clause is beyond dispute. That clause stated that grievance procedures were to be used with regard to "any . . . request or complaint." Indeed, the Company concedes that "(t)here is nothing to limit the scope of this coverage." Brief for Appellants at 7.
 
 
 22
 We also conclude that the Company was "interfer(ing) with and frustrat(ing) the arbitral processes." When Fort Pitt was informed by the Union that the Union denied responsibility for reimbursement, Fort Pitt was required by the Agreement to grieve its objections to the Union's position. Thus, its decision to exercise "self-help" by threatening to cease making premium payments ran counter to the congressional policy of "promotion of the arbitral process as a substitute for economic warfare." United States Steel Corporation v. United Mine Workers, 593 F.2d 201, 204 (3d Cir. 1979).
 
 
 23
 We are unpersuaded by Fort Pitt's claim that it acted properly because for it, arbitration was permissive, not mandatory. Fort Pitt interprets P 97 of the Agreement which states that "(t)he grievance procedure May be utilized by the Company" (emphasis added) as allowing it to seek arbitration or not as it wishes. Thus, the Company argues that it was not required to grieve its objections to the Union's position; instead, it was entitled to terminate the premium payments as an exercise of its management rights.[16] If, according to the Company, the Union objected to the cut-off of the payments, then the Union was required to initiate grievance procedures. Because the Union did not do so, the Company did not, in its view, interfere with the arbitral process.
 
 
 24
 The problem with the Company's approach is that the parts of the Agreement dealing with the grievance procedures applicable to employees also use the permissive word "may."[17] Yet, the Company asserts that the grievance mechanism is obligatory for the Union. If, as Fort Pitt contends, the grievance procedures are indeed mandatory for the Steelworkers despite the permissive language of the Agreement, we cannot say that the district court committed plain error in finding that those procedures are also mandatory for the Company.[18]
 
 
 25
 Finally, we believe that the district court properly exercised its discretion in finding that an injunction was appropriate under equitable principles. The critical issue facing the district court was whether breaches of the contractual agreement to arbitrate caused or threatened to cause irreparable injury to Union members. See Boys Markets, 398 U.S. at 254, 90 S.Ct. 1583. The Company contended that since only the payment of money was involved, there was apparently as a matter of law no risk of irreparable harm. The district court ruled, however, that if injunctive "relief is denied, the hospital and insurance benefits of the union members will lapse." 452 F.Supp. at 890. Fort Pitt now argues that the district court abused its discretion because even after premium payments stopped, benefits would continue for 30 days, at which time the union members would have the opportunity to convert to individual policies.
 
 
 26
 Initially, we agree with the district court that the fact that the payment of monies is involved does not automatically preclude a finding of irreparable injury. If the risk of "water pipes freezing" can constitute irreparable injury, See Celotex Corp. v. Oil Workers, 516 F.2d 242, 247 (3d Cir. 1975), then surely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute "substantial and irreparable injury." Id. Moreover, the risk of irreparable injury was not appreciably lessened merely because the employees allegedly would remain covered for 30 days after premium payments were terminated and because the employees thereafter would have the option to convert to individual policies. There was no assurance at the time the injunction was issued that the strike would end within 30 days; thus there was a significant risk that absent an injunction, the employees would be without insurance coverage. In addition, the likelihood that all of the employees could have exercised their right to obtain individual policies was problematic, because while the employees were on strike, they were not collecting their wages. We conclude, therefore, that the district court did not err in issuing the June 7 and June 23 injunctions.[19]
 
 B. No. 78-2654
 
 27
 It is undisputed that when Fort Pitt ceased advancing premium payments for its employees on October 13, it did so in the face of orders by the district court to continue the payments. Thus, the issue in this appeal is not whether Fort Pitt complied with the June 7 and June 23 injunctions but whether the court erred in rejecting the Company's claim that changed circumstances required the injunctions to be dissolved.
 
 
 28
 Fort Pitt contends that when, during the fall of 1978, an impasse was reached over the version of paragraph 140 to be included in the new Agreement, it was entitled to implement its pre-impasse proposal. Since that proposal did not obligate the Company to advance premium payments during a strike for more than 30 days, the court, in the Company's view, should have vacated the injunction. The Company relies chiefly on American Federation of Television and Radio Artists v. N.L.R.B., 129 U.S.App.D.C. 399, 395 F.2d 622 (1968). There, the District of Columbia Circuit approved the principle, advanced by the NLRB, that:
 
 
 29
 (A)fter bargaining to an impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the (Labor Management Relations Act) by making unilateral changes that are reasonably comprehended within his pre-impasse proposals.
 
 
 30
 Id., 129 U.S.App.D.C. at 401, 395 F.2d at 624.
 
 
 31
 We conclude, however, that American Federation And the impasse doctrine that it espouses are inapposite to the facts of this case. In American Federation, management did not impose its pre-impasse proposals on its employees until both the Entire collective bargaining agreement and a mutually agreed-upon extension had lapsed. Thus, American Federation stands only for the principle that management can unilaterally implement its own pre-impasse proposals when it is not bound by contrary provisions which have been agreed upon by the parties. Here, however, paragraph 140 of the 1975 Agreement was still operative. That paragraph did not even take effect until the rest of the 1975 Agreement had expired and the labor dispute had begun, and did not lapse, by its terms, until the end of the dispute. Thus, because Fort Pitt had already struck a bargain with the Union on paragraph 140, it was precluded from altering the substance of that bargain, without the Union's approval, during the life of paragraph 140 i. e., until the end of the labor dispute.[20] We hold, therefore, that the district court properly held Fort Pitt in civil contempt for violating the June injunctions.[21]C. No. 79-1019
 
 
 32
 In hearings before the district court on December 13, 1978, Fort Pitt asserted that it had totally and irrevocably shut down its plant and dismissed its employees. Thus, under the theory that its obligations under paragraph 140 ceased with the discontinuance of the employer-employee relationship, it requested the district court to vacate the injunction. The Union argued that the announcement of the decision to shut down was merely a ploy by Fort Pitt to evade its obligations under the June injunctions, and that even if the Company actually intended to close the plant, production work being carried out by supervisory personnel would last for three or four months. The Union therefore claimed that until operations at the plant permanently ended, Fort Pitt's obligation to advance premium payments continued. The district court, in maintaining the injunction, concluded that the Company did "intend to close the plant"; it made no finding, however, regarding the Company's claim that the shutdown of the plant had already occurred.
 
 1. The Period Prior to Permanent Shut-Down
 
 33
 Since the district court did not determine whether the plant has permanently discontinued operations, and since the evidence in the record on this matter is in conflict, we are unable to state with assurance that the plant has, as of this date, irrevocably shut down. As a result, we must reject Fort Pitt's request that we vacate the injunctions which restrain the Company from terminating the payments at issue.
 
 
 34
 Fort Pitt concedes that even though the 1975 Agreement has expired, whether its obligation to continue payments survives the announcement of its Decision to shut down is an arbitrable dispute under the doctrine of Nolde Bros. v. Local 358, Bakery Workers, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). The Company contends, however, that the fact that a dispute is arbitrable does not automatically permit a court to grant an injunction against one of the parties to the dispute.
 
 
 35
 We agree with Fort Pitt that the district court's holding that Nolde Bros. governs this case was inaccurate. Nolde Bros. dealt only with whether a dispute which arises out of a contract but which did not occur until after the contract had expired is Arbitrable under the expired contract's arbitration clause; it was silent regarding when and whether a district court may appropriately grant injunctive relief in such a situation. Notwithstanding the district court's reliance on Nolde Bros., however, the denial of Fort Pitt's motion to vacate the injunction was nevertheless correct.
 
 
 36
 Our rationale for upholding the district court's refusal to vacate the injunction rests upon Boys Markets. The Boys Markets exception to the Norris-LaGuardia Act permits federal courts to enjoin conduct stemming from a labor dispute when that conduct "frustrate(s) the arbitral processes." Buffalo Forge, 428 U.S. at 407, 96 S.Ct. 3141. And, as the Fourth Circuit held in Lever Bros. v. International Chemical Workers, Local 217, 554 F.2d 115 (4th Cir. 1976), the arbitral processes are frustrated when the arbitrator's award is no more than "a hollow formality" because "when rendered (it) could not return the parties substantially to the Status quo ante." Id. at 123. Here, it was for the arbitrator to decide whether Fort Pitt was required under paragraph 140 to continue making insurance and hospitalization premium payments until the plant was permanently closed. Yet, if the Company were permitted to cease advancing payments pending arbitration, and if some of the Union members suffered irreparable injury to their health as a result of the termination of payments, the arbitrator's award vindicating the Union's interpretation of paragraph 140 would indeed be only "a hollow formality." We hold, therefore, that the district court did not err in ordering Fort Pitt to continue making premium payments during the period in which the Company winds down its operations at the plan.
 
 2. The Period After Permanent Shut-Down
 
 37
 The district court ruled that whether Fort Pitt's "obligations under Paragraph 140 Terminated upon shut-down of its plant is an arbitrable issue" (emphasis added). Thus, in the district court's view, the injunction must continue not only while Fort Pitt winds down its operations at the plant, but even after the plant has permanently closed, unless the dispute is submitted to and resolved by the arbitrator. We disagree.
 
 
 38
 Our reason for holding that under the facts of this case, the injunction must be dissolved upon final closing of the plant is premised on the very limited scope of the Boys Markets exception to the Norris-LaGuardia Act. Boys Markets injunctions are designed to preserve the status quo when maintenance of the status quo is Needed to protect the arbitral process. And the only time that preservation of the status quo is an appropriate, or even rational, remedy is when the party seeking equitable relief claims entitlement, under the terms of the labor contract, to the status quo relationship with its adversary, or claims that the changes in the status quo contemplated by its adversary are prohibited by the contract.
 
 
 39
 Here, the status quo is represented by Fort Pitt's continued premium payments on behalf of the Union members. Yet, our review of the record demonstrates that the Union never contended before the district court that its members were entitled under paragraph 140 to continued insurance and hospitalization coverage after permanent shut-down of the plant. Nor is there anything in the record evidencing a claim by the Union that paragraph 140 prohibits Fort Pitt from stopping the payments once all work at the plant has ended and the plant has gone out of business.[22] Thus, in the absence of any allegation that the parties contemplated a continuation of benefits beyond final closing, the district court may not order the Company to continue paying the premiums necessary to maintain those benefits once the court finds that the plant has permanently shut down.[23]
 
 CONCLUSION
 
 40
 The orders of the district court appealed from in Nos. 78-2035 and 78-2654 will be affirmed. In No. 79-1019, we remand to the district court for a determination whether all work at the plant has ceased and a final closing of the plant has taken place. If the court finds that the plant is permanently closed, it must dissolve the injunction.
 
 
 41
 Each party shall bear their own costs.
 
 
 
 *
 Honorable Walter K. Stapleton, United States District Judge for the District of Delaware, sitting by designation
 
 
 [1]
 The district court's June 23 order amended a June 7 order enjoining Fort Pitt from "failing to advance . . . the premiums necessary to keep the (employees') hospitalization and insurance policies in effect."
 
 
 [2]
 On December 22, 1978, the district court denied Fort Pitt's motion for reconsideration of the December 18 order
 
 
 [3]
 Agreement, P 98. That paragraph provides:
 STEP 4: In the event the dispute shall not have been satisfactorily settled, the matter shall then be appealed to an impartial umpire . . . . The decision of the umpire shall be final.
 
 
 [4]
 Id. P 91. Paragraph 91 states:
 Any employee who believes that he has a justifiable request or complaint may discuss the request or complaint with his foreman, with or without the grievance committeeman being present, as he may elect, in an attempt to settle same. Any request or complaint settled between the employee and the foreman, without the committeeman present shall not set aside any provisions of the Basic Agreement.
 Any such request or complaint not disposed of within five (5) days and filed in writing, on a grievance form furnished by the Company as later set forth herein shall constitute a grievance within the meaning of this Section.
 
 
 [5]
 Id. P 97. That paragraph reads:
 The grievance procedure may be utilized by the Company in processing Company grievances. In processing such grievances the Company shall observe the specified time limits in appealing and the Union shall observe the specified time limits in answering.
 
 
 [6]
 Instead, the Steelworkers apparently claimed that the local union, rather than the national organization, was solely responsible for guaranteeing repayment, and that repayment was to be made by deductions from employee wages once the work stoppage ended. See Appendix at 56 (Letter from James P. Spresser, Vice President and General Manager of Fort Pitt, to United Steelworkers of America, District Office 15)
 
 
 [7]
 On May 30, 1978, the state court enjoined the Company from "(d)oing any act which would terminate hospital and insurance policies (then) in effect." Pursuant to 42 Pa.Cons.Stat.Ann. § 1531(d) (Purdon 1975), the injunction dissolved five days later
 
 
 [8]
 The court also denied Fort Pitt's motion to dissolve the preliminary injunction. Appendix at 73
 
 
 [9]
 The court further ordered that should Fort Pitt file a grievance regarding the Union's alleged breach of paragraph 140, the Union must expedite the grievance-arbitration process. 452 F.Supp. at 889
 
 
 [10]
 Supplemental Appendix at 77
 
 
 [11]
 Id. at 78. The September 13 proposal provided:
 In the event of a strike resulting from failure of the parties to reach an agreement following proper notice given by either party under the provisions of any collective bargaining agreement, the insurance program will be continued for 30 days. The Company will advance the premiums for coverage during such 30 days. At the end of that 30-day period, premium payments will cease unless during such 30-day period the Union or the employees have made arrangements satisfactory to the Company to continue the premium payments. Sickness and accident coverage will cease immediately except for claims which preceded the strike. . . .
 
 
 [12]
 29 U.S.C. § 104(c)
 
 
 [13]
 29 U.S.C. § 104(a). This section states that "No court of the United States shall have jurisdiction to issue any . . . temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person . . . from . . . (c)easing or refusing to perform any work or to remain in any relation of employment"
 
 
 [14]
 Jurisdiction is seemingly granted by § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1976), which provides that "(s)uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties, . . . without regard to the citizenship of the parties"
 
 
 [15]
 See, e. g., United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers v. American Mfg. Co., 363 U.S 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)
 
 
 [16]
 Fort Pitt relies for the proposition that it was permitted to take the action enjoined by the district court on Section 10, P 102 of the Agreement. Paragraph 102 states that "(t)he company retains all rights to manage the Company and direct the work force not specifically relinquished or abridged by this Agreement."
 
 
 [17]
 See, e. g., P 91 ("Any employee who believes that he has a justifiable request or complaint May discuss the request or complaint with his foreman") (emphasis added); P 92 ("The employee, if dissatisfied with the disposition of the request or complaint as presented to his foreman May have his alleged grievance presented to his superiors by his grievance committeeman) (emphasis added); P 93 ("STEP 2: In the event no satisfactory settlement of the grievance is arrived at in STEP 1 of this procedure, the grievance committee may present the grievance to the Works Manager") (emphasis added)
 
 
 [18]
 The district court's finding is consistent with cases holding that grievance procedures are mandatory despite language in the collective bargaining agreement that the parties "may" invoke those procedures. See, e. g., Bonnot v. Congress of Independent Unions Local # 14, 331 F.2d 355, 359 (8th Cir. 1964); Yale & Towne Mfg. Co. v. Local Lodge 1717, International Ass'n of Machinists, 299 F.2d 882, 883-84 (3d Cir. 1962). See also Controlled Sanitation Corp. v. District 120, International Ass'n of Machinists, 524 F.2d 1324 (3d Cir. 1975), Cert. denied, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976)
 
 
 [19]
 Fort Pitt also contends: 1) that the court abused its discretion in granting the injunction because the Union had "unclean hands"; 2) that the injunction was prohibited by § 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108, which states that "(n)o . . . injunctive relief shall be granted to any complainant . . . who has failed to make every reasonable effort to settle (the) dispute" in question; 3) that the court was not permitted to enjoin the Company to maintain the status quo pending arbitration; 4) and that the June 7 order improperly granted declaratory judgment on an arbitrable dispute. The Company's first two arguments are grounded on two premises: that the Steelworkers were obligated to seek arbitration, and that they bargained in bad faith. We rejected the first premise, with regard to the second, the district court found no evidence that the Union bargained in bad faith. That finding was not in error. Fort Pitt's third argument relies primarily on Amalgamated Transit Union, Div. 1384 v. Greyhound Lines, Inc., 550 F.2d 1237 (9th Cir.), Cert. denied, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977). That court's rationale for holding an injunction requiring an employer to preserve the status quo pending arbitration to be improper, however, ultimately depended on the fact that the party seeking equitable relief could be restored to the Status quo ante by arbitration, and therefore risked no irreparable injury. In this case, the district court's finding, which we do not disturb, was to the contrary. Finally, we have reviewed Fort Pitt's fourth claim, and hold that it is without merit
 
 
 [20]
 Carried to its logical extension, Fort Pitt's theory would have devastating consequences for the sanctity of labor contracts. The Company contends that it was entitled to impose its own proposal because a bargaining impasse had developed, despite the fact that the impasse was over a provision previously agreed on by the parties which was still in effect. In this case, the provision in question was part of an Agreement which had Otherwise expired. Yet, there is no principled reason why the Company's theory would not also apply when the underlying contract was still operative. Thus, under Fort Pitt's view of the impasse doctrine, management would be able to circumvent bargained-for provisions of labor agreements which were still in force merely by bargaining to an impasse after demanding that those provisions be renegotiated
 
 
 [21]
 Our holding is not affected by our earlier decision in Paterson Parchment Paper Co. v. International Brotherhood of Paper Makers, 191 F.2d 252 (3d Cir. 1951), Cert. denied, 342 U.S. 933, 72 S.Ct. 376, 96 L.Ed. 694 (1952). There, a company sued a union for damages resulting from a strike by the union; the issue was whether the collective bargaining agreement, which contained a no-strike clause, was still operative at the time of the strike. The agreement was to be in effect "from August 15, 1947 to August 15, 1948 . . . provided, however, that either party may terminate the same on not less than sixty (60) days written notice given . . . prior to the anniversary date." 191 F.2d at 253. The union timely notified the company of its wish to terminate the contract. Negotiations for a new contract subsequently reached an impasse and the union struck. The Company contended that the strike was illegal because of a separate clause of the old agreement, which provided that "should there be a delay in negotiating the new agreement, this agreement shall remain in full effect until . . . a new agreement is completed." Id. We rejected the Company's assertion that this clause bound the union not to strike even after negotiations had broken down, holding that the parties did not intend for the old agreement to remain in effect after an impasse. Id. at 254
 Fort Pitt reads into Paterson Parchment the broad principle that "contractual provisions should not be construed as being indefinite in duration." Supplemental Brief for Appellant at 17. In our view, however, Paterson Parchment is a narrow holding which focuses on the intent of the parties with regard to the contract. There, we held that the parties intended to extend the contract only until it became obvious that negotiations had entirely broken down. Here, however, we are dealing with a contract provision which by its terms extends until the conclusion of a labor dispute. And that dispute did not end merely because the parties had allegedly reached an impasse with respect to one provision of the new collective bargaining agreement. Thus, the district court held, and we agree, that when the parties bargained in 1975, they intended that paragraph 140 would remain in effect as long as the labor dispute continued. Nothing in Paterson Parchment compels a different result.
 
 
 [22]
 Instead, the Steelworkers claimed (1) that Fort Pitt did not intend to close the plant at all; (2) that even if the Company did so intend, permanent shutdown has not yet occurred; (3) that the injunction should be maintained because Fort Pitt continues to claim that the Union itself was in breach of paragraph 140; (4) and that the injunction should be maintained because Fort Pitt was in violation of other provisions of the 1975 Agreement. The first two of these claims, by their terms, only contemplate the continuation of the injunction Until final plant closing. The third contention fails to suggest why preservation of the status quo is necessary to prevent the Union from suffering an irreparable injury. Finally, with regard to the fourth allegation, continuation of the premium payment injunction would be patently inappropriate
 
 
 [23]
 Because we find that the Union did not allege that it was entitled to insurance and hospitalization benefits after plant closing, we need not reach the question whether such a claim would be so frivolous as to preclude the district court from granting equitable relief. See Lever Bros., 554 F.2d at 120