LOCAL 692, UNITED FOOD AND
COMMERCIAL WORKERS
UNION, AFL–CIO, et al.

v.

PANTRY PRIDE, INC.

LOCAL 117, UNITED FOOD AND
COMMERCIAL WORKERS
UNION, AFL–CIO

v.

PANTRY PRIDE, INC.

Civ. Nos. 4–81–2008, 4–81–2198.

United States District Court,
D. Maryland.

Sept. 11, 1981.

Ira M. Lechner, Carey R. Butsavage, Washington, D.C., and Julius W. Lichter, Towson, Md., for plaintiff Locals # 692, 570, and 355.

Peter G. Angelos, and Shepard A. Hoffman, Baltimore, Md., for plaintiff Local # 117.

Robert B. Barnhouse, Baltimore, Md., counsel for defendant.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

Plaintiff labor organizations, Local 692 (United Food and Commercial Workers Union), Local 570 (Warehouse Employees Local), Local 355 (Truck Drivers, Helpers, Taxicab Drivers, Garage Employees and Airport Employees), and Local 117 (United Food and Commercial Workers Union) brought a consolidated action to compel arbitration under the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and seek a preliminary injunction pursuant to Rule 65 of Federal Rules of Civil Procedure ordering defendant Pantry Pride to continue payment of health care coverage for terminated employees pending the outcome of arbitration proceedings.

## BACKGROUND

Pantry Pride submitted itself to Chapter XI bankruptcy proceedings in 1978. The petition was filed in Bankruptcy Court in the Southern District of New York, where an order restraining all further actions, suits or proceedings against the defendant or its property wherever located was issued under Rule 11–6 of the Rules of Bankruptcy Procedure and 11 U.S.C. § 362 (1979).

Defendant continued operation of its business as a debtor in possession and in 1980 entered into a three-year collective bargaining agreement with the plaintiff unions. The 1980 Agreement, to run from September, 1980 until August, 1983, contains a "broad" arbitration clause. *Retail Store Employees Union Local 400 v. Great Atlantic & Pacific Tea Company,* 480 F.Supp. 88 (D.Md.1979). The Local 692 contract provides, for example, that "[s]hould a controversy, dispute or disagreement arise during the period of this Agreement concerning the interpretation of the provisions of this Agreement" the dispute will be submitted to arbitration.

On July 6, 1981, the Bankruptcy Court entered an order confirming a plan of arrangement releasing Pantry Pride from its jurisdiction, except with respect to certain enumerated assets and claims which included the stores and regional office of the Baltimore area. The Company had tentatively decided to liquidate its Maryland stores and had set up a schedule to close all those stores between August 12 and 18, 1981. With this schedule in mind, Pantry Pride, through its Senior Vice-President for Industrial Relations, Darrell Stiffler, Jr., contacted union representatives in early July, 1981, to determine whether any concessions could be reached to allow Pantry Pride to remain in business in the Baltimore area.

On July 10, 1981, Stiffler met with officials of all four unions and informed them that Pantry Pride would need $16,500,000 in concessions during the next two years to stay in business. Stiffler presented a proposal for the unions which included cutting personnel, forgoing scheduled wage increases, eliminating premium pay for Sundays and holidays, and reducing health and welfare contributions. The proposal also included a profit-sharing arrangement under which any profits earned in a six-month period would be shared equally with the members of the bargaining unit. In response, the unions agreed to the $16,500,000 reduction but insisted that such reductions come from wages, not reduced benefits. The unions also required the Company to assure the unions that the stores would remain open for the balance of the two years under the collective bargaining agreement. The only exceptions to the store closing were for Stores No. 27, 31, 32, 125 and two stores in Dover, Delaware.

At this meeting, Stiffler advised the unions that because of the time clock set up by the bankruptcy court, the unions would have to confirm the agreement by July 24, 1981, in order to prevent the proposed liquidation. The parties set up a timetable for future meetings. The next proposed meeting, set for July 21, 1981, was accelerated by a telephone call from John Sullivan,

representing Local 355 to Stiffler on July 13, 1981. Stiffler flew to Baltimore on the evening of July 13, 1981, and met with Sullivan and Alvin Akman, president of Local 692, through the night of July 13 into the morning hours of July 14, 1981. The Union representatives left the July 14, 1981 meeting with Stiffler believing they had a binding modification of the collective bargaining agreement which required the unions to make $16,500,000 in wage concessions over the next two years in exchange for the company's agreement to keep the Baltimore area stores open for that length of time. The purported agreement included the 50% profit-sharing arrangement. Stiffler was to memorialize the agreement in writing and arrangements were made to close the stores on July 20, 1981, so that the members could meet to ratify the agreement.

On July 15, 1981, at a meeting in Fort Lauderdale, Florida, the key members of the board of directors of Pantry Pride decided that due to new financial information which was available to the company for the first time that day, the $16,500,000 was not sufficient to allow the Maryland stores to remain open without draining the other areas of the Pantry Pride operation and jeopardizing the bankruptcy proceedings. Consequently, Pantry Pride called each union that day and announced that it would begin closing its stores within 30 days, and could not honor the alleged agreement.

On July 17, 1981, Local 692 telegraphed Stiffler requesting arbitration pursuant to the arbitration clause of the contract. The other unions followed suit. Pantry Pride refused to recognize that there was a binding modification of the 1980 Agreement and refused to arbitrate. Local 692 then filed a complaint for injunctive relief seeking to force Pantry Pride to proceed to arbitration and to restrain it from closing the Maryland stores pending the decision of the arbitrator. *Local 692 v. Pantry Pride*, Civil No. JH–81–1823 (D.Md. July 24, 1981). Judge Howard dismissed the case on motion of the defendant stating that the Bankruptcy Court retained exclusive jurisdiction over the stores involved. Slip Opinion at 7.

On August 3, 1981, the Bankruptcy Court denied plaintiff unions a preliminary injunction to halt the closing of the Maryland stores and refused to order arbitration. At the same time the bankruptcy court lifted and vacated any stays, thus permitting the unions to bring suit in a court of competent jurisdiction or to proceed to arbitration to "determine whether Pantry Pride breached any alleged agreements by closing the Baltimore area stores and whether the unions and their members are due monetary damages because of any alleged breaches." *In re J. M. Fields, Inc., Food Fair, Inc., et al.*, Nos. 78B1764–78B1773 (S.D.N.Y. August 3, 1981). The stay was lifted provided that such proceedings do not interfere with the procedures instituted in the bankruptcy proceedings for Pantry Pride to go out of business by closing the Baltimore area stores.

Pantry Pride has since closed all the stores in the Baltimore area and terminated the union employees. The health and welfare benefits terminated on the last day of the month of each employees' termination of employment.

Thereafter plaintiffs filed this application for preliminary injunction and sought an order requiring defendant to submit to arbitration. The evidentiary hearing was held on the issue of the preliminary injunction to enable the Court to make a determination of the plaintiffs' likelihood of success on the underlying dispute, *i. e.*, whether there is a modification of the 1980 Agreement that is subject to the arbitration clause.

## DISCUSSION

The Fourth Circuit summarized the applicable rule of law with respect to the trial court standard for interlocutory relief in *North Carolina State Ports Authority v. Dart Containerline Co., Ltd.*, 592 F.2d 749, 750 (4th Cir. 1979):

> [I]n this circuit the trial court standard for interlocutory relief is the balance-of-hardship test. Four factors enter into the determination of whether to grant or to withhold interim injunctive relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties;

(b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest. There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction.

This standard was reconfirmed in *Wetzel v. Edwards*, 635 F.2d 283 (4th Cir. 1980). There are special concerns controlling the exercise of federal judicial power in arbitrable labor disputes, however, which make modification of this mode of analysis necessary. *Columbia Local, American Postal Workers Union, AFL-CIO v. Bolger*, 621 F.2d 615 (4th Cir. 1980). One of these considerations is the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115 (1976), which limits the jurisdiction of the federal courts to issue injunctive relief in certain situations in cases involving labor disputes.[1]

## LIKELIHOOD OF PLAINTIFFS' SUCCESS ON THE MERITS

In considering the likelihood of the plaintiffs' success on the merits, it is first necessary to understand what the "merits" are in the context of the case. The likelihood of prevailing on the "merits" is equated with the "likelihood that the Union would prevail at a trial on the merits." *Lever Brothers Co. v. International Chemical Workers Union*, 554 F.2d 115, 119 (4th Cir. 1976). Thus, on the instant motion, the Court is concerned with the likelihood of the unions' being able to establish that: (1) the dispute of which they complain is for the arbitrator, and (2) they will be entitled to an injunction requiring the defendant to pay health and welfare benefits pending a final decision of an arbitrator.

The first obvious step in determining whether the plaintiffs' dispute is for the arbitrator is to determine what the dispute is. The unions are seeking arbitration of a dispute arising out of the alleged amendment of July 14, 1981 to the 1980 Collective Bargaining Agreement. To establish that this dispute is for the arbitrator, they must establish whether the discussions of July 13–14, 1981 resulted in a legally binding amendment to the collective bargaining agreement. It is for the Court, not the arbitrator, to determine this, and if the Court finds that there is such an amendment, to determine the issues to be submitted to arbitration. *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Lever Bros., supra*, 554 F.2d at 118.

Although the hearing on September 1–2, 1981, purported to concern only the necessity for the issuance of a preliminary injunction, the Court finds that the testimony taken was sufficient to allow it to determine not only the likelihood of the plaintiffs' success on the issue of whether there is an arbitrable dispute, but to determine the merits of that question itself. Indeed, the plaintiffs, in their post-hearing briefs, indicate that they expect that the Court will rule definitively on that question.

The Court heard testimony from the chief negotiator of each of the four unions, all of whom were present at the July 10, 1981 meeting, and two of whom, Akman and Sullivan, were present at the July 14, 1981 meeting. The Court also heard testimony from Darrell Stiffler, Chief Negotiator for Pantry Pride; Ellwood Adams, Corporate Director for Personnel Services, who was present at the July 10 meeting; and Roger Galassini, President and Chief Operating Officer of Pantry Pride, who was present at the July 15 meeting in Fort Lauderdale.

▪ The Court finds that there was an agreement reached between the parties on July 14, 1981, which effectively amended their collective bargaining agreement. This amendment is subject to the arbitration clause. The amendment included an agree-

---

1. In addition, in the case at bar, the Court must consider the effect of the jurisdiction of the Bankruptcy Court on the proceedings in this Court. This will be discussed *infra*.

ment by the unions to make wage concessions in the amount of $16,500,000 over a two-year period in exchange for Pantry Pride's agreement to keep the Baltimore area stores open for that amount of time. The issue for the arbitrator is whether the agreement of Pantry Pride was a guarantee to keep the stores open or merely a promise to exert its best efforts in that direction. The arbitrator must also decide whether Pantry Pride breached its agreement and what damages, if any, it owes to the union. The Court may not predetermine these issues; consequently, the findings will be on the very narrow issues of the existence of a binding agreement and its parameters.

This decision is based on the following findings of fact:

1. On July 10, 1981, Darrell Stiffler, representing Pantry Pride, with authority to negotiate for the company, met with Alvin Akman, John Sullivan, Tony Monti, and Gerald Menapace, representing the plaintiff unions, and proposed that in exchange for the unions' concession of $16,500,000 in wage and benefit concessions over the next two years, the Baltimore area stores could remain open and viable for that amount of time.

2. The parties agreed to meet at a later date, with Akman and Sullivan having authority to negotiate for Monti and Menapace, who expected to have scheduling problems.

3. Stiffler met with Akman and Sullivan on July 14, 1981, and reached a binding agreement that, among other provisions, provided the unions would give up $16,500,-000 in wage concessions over the next two years in exchange for Pantry Pride's agreement to keep the Baltimore stores open for that length of time.

4. The unions understood that their members must ratify the agreement by July 24, 1981, so that Pantry Pride could stay within the timetable set up by the bankruptcy court.[2]

## IRREPARABLE INJURY TO PLAINTIFFS IF INTERIM RELIEF IS NOT GRANTED

■ The second question the Court must address when considering interlocutory relief is whether the plaintiff will suffer irreparable injury if interim relief is not granted. Due to the interaction resulting from the order of the Bankruptcy Court and the provisions of the Norris-LaGuardia Act, this Court has no jurisdiction to afford such relief and the preliminary injunction must be denied.

The pertinent provision of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115 (1976), provides:

No court of the United States shall have jurisdiction to issue any . . . temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons . . . from

(c) Paying or giving to, or withholding from any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or thing of value . . .

29 U.S.C. § 104.

Plaintiffs assert that the instant case falls within the exception to the Norris-LaGuardia Act created by *Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), in which the Supreme Court found that federal courts have limited jurisdiction to intervene in labor disputes despite 29 U.S.C. § 104 if equitable remedies are necessary to

---

2. There has been much discussion about the importance of ratification to the enforceability of the agreement on July 14, 1981. It is clear from the testimony that the long-standing practice of the parties was that the negotiators present had the authority to represent their respective principals at the bargaining table and that the oral agreement reached at the negotiating session was binding. Ratification was not a precondition to the enforceability of

any collective bargaining agreement. Reduction of the agreement to writing and its subsequent ratification by the membership was a matter of mechanics. This is in accord with federal law. *N.L.R.B. v. Truckdrivers, Etc., Union No. 100*, 532 F.2d 569 (6th Cir.), *cert. denied*, 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137 (1976). The outside time constraints in the instant case were set up to protect the timetable of the bankruptcy proceedings.

further the federal policy in favor of arbitration. Because the requested injunction in the instant case would have no effect on the arbitration process, this Court is outside the *Boys Market* jurisdiction.

The order of the Bankruptcy Court of August 3, 1981, lifted the automatic stay on proceedings against the debtor pursuant to 11 U.S.C. § 362, to allow the unions to pursue necessary actions to "determine whether Pantry Pride breached any alleged agreements by closing the Baltimore area stores and whether the unions and their members are due monetary damages because of any alleged breaches." Slip Opinion at 6. The lifting of the stay was expressly conditioned on the fact that no court or arbitrator would have jurisdiction "to interfere with the going-out-of business sales presently being conducted by the Debtors, and sale of the leases, or the closing of the Baltimore area stores[.]" *Id.*

The order was based on the Bankruptcy Court's conclusions of law that the "Unions and their members will not be irreparably harmed by the continuation of such going-out-of business sales. If by closing the said stores, Pantry Pride has breached any union contract, monetary damages are available as a remedy." *Id.* at 5. Therefore, neither this Court nor an arbitrator has jurisdiction to do anything other than determine the existence of a breach of contract and award damages therefor. There is no authority to stop the closing of the area stores or preserve the jobs of the affected employees. The affected employees now know that they must seek other employment and that they must obtain health insurance either privately or with another employer. Pantry Pride will not be required to continue paying health and welfare premiums as such for its former employees even after arbitration.

This is not a case similar to *Lever Bros., supra*, 554 F.2d 115, in which the court issued a preliminary injunction to preserve the *status quo* pending the outcome of arbitration. *Lever Bros.* fell under the *Boys Market* exception because the injunction

was necessary to preserve the efficacy of the arbitration clause. *Lever Bros.* was planning to close its Baltimore plant permanently and transfer production to Indiana. The Union had the possibility through arbitration of receiving information and buying time to attempt to persuade the company not to transfer the plant. The court issued a preliminary injunction to keep the plant in Baltimore open pending arbitration because there was the chance that the arbitration would preserve the *status quo*. Failure to maintain the *status quo ante* pending arbitration could have seriously jeopardized the outcome of the arbitration process. Had the company moved the plant, and then the unions won in arbitration, the unions would have had the double burden of convincing the company that it should not have moved the plant initially and that it should move the plant back to Baltimore after the arbitration decision. 554 F.2d at 122.

Such is not the situation in the Pantry Pride controversy. There is no possibility that the *status quo ante* will be maintained after arbitration because of the limitations of the order of the Bankruptcy Court. Plaintiffs cite *United Steelworkers of America v. Fort Pitt Steel Casting*, 452 F.Supp. 886 (W.D.Pa.1978), as an instance in which the court issued a preliminary injunction ordering the defendant company to continue paying employees' health insurance premiums pending mandatory arbitration. Again, *Fort Pitt* is distinguishable from the case *sub judice* for two reasons. First, the steelworkers' contract with Fort Pitt contained a clause specifically providing that the company would continue paying hospitalization and insurance premiums in the event of a labor dispute at the end of the existing agreement. Both parties had contemplated that there would be an eventual end to any labor dispute, that the union would reimburse the company for payments made,[3] and that the employee-employer relationship would ultimately continue. Second, while the steelworkers were on strike, they would have no means of paying

---

**3.** Reimbursement was specifically provided for in the contract.

for individual policies because they were receiving neither wages nor unemployment benefits. Thus, the court found there would be irreparable injury to the plaintiff. 452 F.Supp. at 890.

The Third Circuit affirmed the district court's initial granting of the injunction in *United Steelworkers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3d Cir. 1979). The company had asserted, however, its intention of closing the plant permanently due to the total failure of the collective bargaining process. The Court of Appeals remanded the case for a determination whether the plant had closed permanently, with orders to dissolve the injunction if such were the case. 598 F.2d at 1283. The court found that when the plant closed, there was no need to maintain the *status quo* in order to preserve the arbitral process. Thus, the injunction was no longer within the *Boys Market* exception. *Id.* As in the case at bar, the union never contended that its members would be entitled to continue insurance and hospitalization coverage after the permanent closing of the company's operation. This Court, by similar reasoning, has no jurisdiction to issue the requested preliminary injunction.

Accordingly, it is this 11th day of September, 1981, by the United States District Court for the District of Maryland, ORDERED:

1. Plaintiffs' application for preliminary injunction be, and the same is, hereby DENIED; and

2. Defendants shall forthwith submit the issue of the breach of the July 14, 1981 amendment to the collective bargaining agreement to arbitration.