INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW

v.

EXIDE CORPORATION.

Civ. A. No. 88-3257.

United States District Court, E.D. Pennsylvania.

May 31, 1988.

Wm. T. Josem, Philadelphia, Pa., for plaintiff.

John Markle, Jr., Philadelphia, Pa., for defendant.

### FINDINGS OF FACT, DISCUSSION, AND CONCLUSIONS OF LAW

HUYETT, District Judge.

On April 19, 1988, plaintiff, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW or the union), filed a complaint and motion seeking to enjoin defendant Exide Corporation (Exide or the company) from unilaterally changing health insurance carriers and from reducing the health insurance benefits and wages of its hourly employees represented by the union pending the completion of grievance and arbitration proceedings. Plaintiff union also seeks an order compelling the company to arbitrate a grievance brought by the union pursuant to the parties' collective bargaining agreement. Specifically, the union seeks an arbitrator's decision on the issue

of whether the company unilaterally may change health insurance carriers and reduce wages and health insurance benefits, absent agreement of the union, pursuant to an economic reopener provided for in the collective bargaining agreement. This action was brought pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a)[1].

Following a hearing held May 17, 1988, I issued an order granting the union's motion for a preliminary injunction. Defendant appealed this injunction and moved for a stay pending appeal. Defendant's motion for a stay was argued at a hearing held Monday, May 23, 1988. At the hearing, defense counsel stated that defendant only sought a stay or modification of that part of the May 17, 1988 injunction applying to wages. Defendant agreed to continue medical insurance coverage of its employees by its former insurance carrier pending appeal. On May 23, 1988, I issued an order *nunc pro tunc* modifying the May 17, 1988 injunction to compel arbitration and to restrain the defendant only from changing health insurance carriers and benefits.

The following findings of fact and conclusions of law are made in support of the May 17, 1988 injunction as modified by my order dated May 23, 1988.

## FINDINGS OF FACT

1. Plaintiff, UAW, is an unincorporated association and a labor organization representing employees in an industry affecting commerce within the meaning of Section 2(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(5), with offices located at 8000 East Jefferson Avenue, Detroit, Michigan 48214. (Stipulation of Uncontested Facts, § 1)[2]

2. Defendant, Exide is a Delaware corporation with its corporate headquarters located at 645 Penn Street, Reading, PA 19612. Defendant Exide is an employer engaged in an industry affecting commerce within the meaning of Section 2(2) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(2). (SF, ¶ 2)

3. Exide and the UAW are parties to a national collective bargaining agreement covering the terms and conditions of employment of UAW represented employees who work at Exide's facilities in Allentown, Pennsylvania; Burlington, Iowa; Denver, Colorado and Logansport, Indiana. This agreement is effective from April 1, 1987 to April 1, 1990 (SF, ¶ 3; Joint Exhibit 1)[3]

4. Exide is also a party to a series of local collective bargaining agreements with UAW Locals 1206, 1829, 186 and 84 covering UAW represented employees at the above listed Exide facilities. Each of these local agreements is effective from April 1, 1987 until April 1, 1990. (JE 2)

5. Each of the local collective bargaining agreements sets forth wage rates for employees in each job classification represented by the UAW and its local union. (*See, e.g.,* JF 2, App. C–1 and C–2)

6. Exide and UAW are also parties to a group insurance agreement effective from April 1, 1987 until April 1, 1990 covering Exide employees represented by the UAW. (SF, ¶ 5).

7. The UAW represents approximately 90 Exide employees in Allentown, Pennsylvania; 140 Exide employees in Logansport, Indiana; 260 Exide employees in Burlington, Iowa; and 15 Exide employees in Denver, Colorado.

8. During the 1987 national negotiations, the parties orally agreed to an economic reopener in 1988 covering all economic items including wages and insurance coverage. This economic reopener is provided for in the national agreement in Article XIV concerning holidays and Article XXVII concerning the cost of living adjustment. Article XIV states, in pertinent part:

1. Section 301(a) states in relevant part

 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between

 any such labor organizations, may be brought in any district court of the United States....

2. Hereinafter "SF".

3. Hereinafter "JE".

The Company will grant an additional two (2) holidays in the second year of the agreement. The exact schedule of those holidays will be negotiated with the economic reopeners in 1988.

Article XXVII states, in relevant part:

COLA remains suspended at least until the 1988 economic reopener.

(JE–1)

9. Article VII of the national collective bargaining agreement contains a no strike clause which provides in pertinent part:

Except as otherwise provided in Article VI of this Agreement, neither the Union nor any of the employees will cause or participate in any strikes, slowdowns, or work stoppages; and the Company agrees that it will not cause any lockouts.

(J–1)

10. Mr. Jack Sosiak testified at the May 17, 1988 hearing. I found him to be a candid witness and his testimony to be frank and honest.

11. Mr. Sosiak is Vice–President of Human Resources at Exide and was the company's chief spokesman during negotiations of the 1987 UAW–Exide national collective bargaining agreement.

12. Mr. Sosiak testified that in 1987 when the company agreed to the economic reopener it intended that the union would have the right to strike and the company the right to implement its last proposal after impasse pursuant to the economic reopener.

13. Mr. Sosiak also testified that the company never conveyed this intention to the union. In other words, the parties did not discuss the possible consequences of their failure to reach agreement pursuant to the economic reopener.

14. The parties did not change the no strike clause found in Article VII of the national collective bargaining agreement.

15. Mr. Sosiak testified further that the Allentown wages were cut because the Allentown plant was losing money, although Exide, as a whole, was profitable in the last fiscal year. According to Mr. Sosiak, Exide changed insurance carriers because Blue Cross/Blue Shield increased its premiums by 52%.

16. In January, 1988, the UAW and Exide began negotiations pursuant to the economic reopener. Had the parties reached agreement on any economic term pursuant to the reopener negotiations, those terms would have become effective April 1, 1988, unless otherwise agreed. (SF, ¶ 7)

17. On January 21, 1988, the parties held their first meeting concerning the economic reopener, at which the UAW presented a written proposal to Exide. (SF, ¶ 7; see JE–4)

18. On February 23, 1988, Exide presented its counterproposal to the union at the parties' second reopener meeting. (SF, ¶ 8; see JE 5) Both proposals included changes with respect to wages and insurance.

19. By letter dated March 1, 1988, Exide advised the UAW that if no agreement could be reached, Exide would implement on April 1, 1988 its proposal offered on February 23, 1988, as modified. (JE 6; SF ¶ 9)

20. By letter dated March 21, 1988, UAW advised Exide that if no agreement could be reached in the economic reopener negotiations, the UAW would insist that Exide adhere to the provisions of the existing national agreement. (JE 7; SF, ¶ 10)

21. The parties again met to discuss the economic reopener on March 28, 1988. As of the conclusion of that meeting, the parties had not reached any agreement on wages, hours or other terms and conditions of employment. Exide advised the union that it considered the negotiations to be at an impasse and it would implement its last proposal on April 1, 1988. (SF, ¶ 11)

22. Despite the lack of agreement, Exide implemented certain changes in terms and conditions of employment effective April 1, 1988 including:

a. Pensions frozen through March, 1990;

b. Welfare benefits frozen through March, 1990;

c. Elimination of cost of living allowance;

d. Elimination of SUB plan;

e. Elimination of payback and security agreement and all money owed under existing payback arrangements;

f. Elimination of one day waiting period for sickness and accident benefits granted for out-patient service exceeding $25.00;

g. Reduction of wage rates of $4.35 per hour in Allentown, $1.00 per hour in Burlington, $2.00 per hour in Denver and $2.75 per hour in Logansport; and

h. Additional holidays scheduled for the second and third years of the agreement.

(JE 8 and 9; *see* SF, ¶ 12)[4]

23. Effective April 1, 1988, Exide also unilaterally changed insurance carriers for the health insurance program covering UAW represented employees from Blue Cross/Blue Shield to Connecticut General Life Insurance Company (Connecticut General). The insurance benefits provided by Connecticut General differ from those provided by Blue Cross/Blue Shield in a number of respects, including, *inter alia:*

a. Under the Connecticut General plan, each insured person has a lifetime maximum benefit of $1,000,000 available for payment of covered medical expenses; Blue Cross/Blue Shield had no such limit. (DE 1);

b. Under the Connecticut General plan, the deductible is $200 per person per calendar year; the combined deductible for all covered family members is limited to $400.00 per year. Under Blue Cross/Blue Shield, there was no deductible. (DE 1);

c. Under the Connecticut General plan, after the deductible has been satisfied, the plan pays 65% of most covered expenses. After the 35% out of pocket share has reached $5,000 in a

calendar year (or $10,000 per family), the plan pays 100% for the remainder of that year. Under Blue Cross/Blue Shield, the plan paid the usual and customary fee for covered services with no co-pay by the employee. (DE 1);

d. Under the Connecticut General plan, prescription drugs are considered a covered expense subject to the deductible and reimbursement requirements. Under Blue Cross/Blue Shield, covered persons essentially paid $4.00 per prescription only. (DE 1);

e. Under the Connecticut General plan, covered persons are required to obtain a pre-admission certification prior to being admitted to a hospital. If a patient's hospital admission or length of stay is not certified by Connecticut General, the patient's benefits are reduced. Blue Cross/Blue Shield had no such requirement. (JE 13); and

f. Under the Connecticut General plan, a second surgical opinion is required for certain elective surgical procedures. Surgical medical benefits are reduced by 50% should the patient fail to get a second opinion before certain surgical procedures. Blue Cross/Blue Shield had no such requirement. (JE 14).

24. On April 18, 1988, the union and Exide met to discuss the wage cuts, but reached no agreement.

25. Robert Humanick testified at the May 17, 1988 hearing. I found him to be a credible witness, and his testimony to be candid and frank.

26. Mr. Humanick is an "automatic acid fill on the shortline" worker who has been employed by Exide for nine years. He is also President of UAW local 1206 at the Exide plant and chairman of the Exide union counsel.

---

**4.** Plaintiff union originally sought to enjoin the company from discontinuing medical insurance benefits for future retirees because the company initially suggested that it would discontinue these benefits. The company has since agreed not to implement this discontinuance of retiree benefits. Defendant's Exhibit 6(a) and (b). Therefore, there is no need to restrain the company from discontinuing retiree benefits.

27. Mr. Humanick is married and has one child. He received $9.15 per hour in wages before the April 1, 1988 wage cuts and presently receives $5.75 an hour in wages.

28. Mr. Humanick rents his residence at a monthly rent of $382, which will be increased by $20 per month as of July 1, 1988. He pays $45 in utilities per month and $150 per month in credit cards and personal loan bills.

29. Mr. Humanick testified that he and his family had nominal savings and would have only "a few hundred dollars to pay" should he, his wife or child become seriously ill. Mr. Humanick also testified that several employees had serious medical problems, such as cancer.

30. Some time after April 1, 1988, Blue Cross/Blue Shield advised the employees to continue to use their Blue Cross/Blue Shield cards until medical care providers refused to honor these cards. Employees continued to present these cards to health care providers until Monday, May 9, 1988 when Blue Cross/Blue Shield instructed the employees that it would no longer process their claims.

31. Mr. Robert Alpert testified at the May 17, 1988 hearing. I found him to be a credible witness and his testimony to be frank and candid.

32. Mr. Alpert is a senior consultant in the social security department of the UAW. As such, Mr. Alpert analyzes, designs and negotiates health care and pension benefit plans.

33. Mr. Alpert testified that Blue Cross/Blue Shield has an extensive network of doctors with whom it contracts. Pursuat to these contracts, the doctors are paid a "usual, customary and reasonable rate" for the services they perform for patients covered by Blue Cross/Blue Shield insurance. Blue Cross/Blue Shield also contracts with hospitals who agree to provide Blue Cross/Blue Shield patients with a reduced hospital rate. Blue Cross/Blue Shield pays for covered procedures performed by participating doctors in full. A patient covered by Blue Cross/Blue Shield is not required to pay any amount to a participating doctor or hospital in advance of treatment.

34. Connecticut General does not have such a network. Under the Connecticut General Plan, a physician either bills patients for services performed or demands payment before treatment. Connecticut General then indemnifies the patient less the $200 deductible and the 35% co-payment.

35. Unlike the Blue Cross/Blue Shield plan, the Connecticut General plan places no limit or cap on physician or hospital rates. According to Mr. Alpert, the absence of a rate cap results in higher charges to patients.

36. Mr. Alpert also testified that because co-payment plans such as Connecticut General's sometimes involve pre-payment by the patient of part or all of the medical bill, doctors and hospitals have refused to treat or admit patients who were financially unable to make this pre-payment.

37. Under the Connecticut General plan, should an employee be faced with a serious illness he would be expected to contribute up to $5,200 to his medical bills per year. Similarly, a family faced with a serious illness would be expected to contribute up to $10,400 to its medical bills per year.

38. On April 13, 1988, UAW filed a grievance with Exide in which the UAW grieved Exide's unilateral change in insurance carriers and reduction of wages and insurance benefits arguing that the economic reopener did not allow the company to make these unilateral changes. The union also sought expedited grievance and arbitration proceedings and asked the company to refrain from implementing these changes until the arbitrator had ruled. (JE 10) The local unions also filed grievances over each of the changes made by Exide. (Plaintiff's Exhibits 3(a)-(1), 4(a)-(s), 5(a)-(j), and 6(a)-(i)) [5]

---

5. Hereinafter "PE".

39. The grievances of the UAW and the local unions are currently being processed in the grievance procedure. The Allentown grievance is presently at the international union level.

40. The national collective bargaining agreement, at page 47, contains an arbitration clause which states in relevant part:

When INTERPRETATION AND APPLICATION of the National Agreement is in question at the local level and the compulsory steps of the grievance procedure have been exhausted, notice shall be given to a representative of the International Union in Detroit and a Headquarter's representative of the Company's Human Resources Department. These two (2) representatives shall, within fifteen (15) working days, attend a grievance meeting at the facility involved unless the representatives agree that they cannot resolve the issues in another manner.... IF NOT RESOLVED, EITHER REPRESENTATIVE MAY SUBMIT THE DISPUTE TO ARBITRATION within fifteen (15) calendar days after the meeting or final discussion.

(JE–1) (emphasis added).

41. Article V, Section 3 of the separate group insurance agreement is entitled "Non–Applicability of Collective Bargaining Agreement Grievance Procedure" and states in relevant part:

No matter respecting the Group Insurance Program as contained in this Agreement, or any difference of opinion arising thereunder, shall be subject to the grievance procedure established in any collective bargaining agreement between the Company and the Union.

(JE–3)

42. Article III, section 1D of the group insurance agreement states:

If in its judgment the Company considers it advisable in the interests of the employees in any locality, another type of local plan or plan insured by an insurance company or other plan selected by the Company may be substituted in such locality or localities for all or part of the coverages referred to herein, after mutual agreement between the company and the union.

(JE–3)

## DISCUSSION

Plaintiff union's request for equitable relief was twofold: first, the union sought an order compelling defendant company to arbitrate the issue of whether the company may change health insurance carriers and reduce wages and health care benefits absent the union's agreement pursuant to the economic reopener; second, the union sought an order enjoining the company from implementing the above changes pending arbitration. By order dated May 17, 1988, the court granted the plaintiff's requested relief. By order dated May 23, 1988, the court modified this injunction *nunc pro tunc* to deny plaintiff's requested relief as to the wage reductions.

*Order Compelling Arbitration*

 A party cannot be compelled to submit a dispute to arbitration unless he has contractually agreed to do so. *A.T. & T. Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *Morristown Daily Record v. Graphic Communications Union Local 8N*, 832 F.2d 31, 33 (3d Cir.1987); *E.M. Diagnostic v. Local 169*, 812 F.2d 91, 94 (3d Cir.1987). A party's agreement to arbitrate is a matter of contract construction and whether a dispute is arbitrable is a question of law for the court. *Morristown Daily Record*, 832 F.2d at 33. *Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1097 (3d Cir.1985). In the *Steelworkers Trilogy*,[6] the United States

---

6. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363

Supreme Court announced the proper standard in a section 301 action for deciding the parties' rights and obligations to arbitrate disputes under a collective bargaining agreement. In *American Manufacturing Co.*, the Court stated:

[t]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.... [T]he moving party should not be deprived of the arbitrator's judgment, when it was his judgment that was bargained for.

*American Manufacturing Co.*, 363 U.S. at 567–68, 80 S.Ct. at 1346.

In light of the strong federal policy favoring arbitration of labor disputes, the courts have implemented, in effect, a strong "presumption in favor of arbitrability which should only be dispelled when the agreement explicitly exempts certain conduct ... or when the terms of the agreement, read as a whole, clearly envision nonarbitrability." *Controlled Sanitation Corp. v. District 128, International Assoc. of Machinists and Aerospace Workers*, 524 F.2d 1324, 1328 (3d Cir.1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed. 2d 319 (1976). *See also Morristown Daily Record*, 832 F.2d at 34. An order to arbitrate a grievance should be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.... In the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Warrior & Gulf Navigation*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53; *see also Nursing Home*, 759 F.2d at 1097.

■ In the instant case it appears that the question of whether the company has

the right under the contract unilaterally to implement its final proposal upon reaching impasse in reopener negotiations presents a dispute over the "interpretation and application of" the collective bargaining agreement within the arbitration provision of the contract. The grievance/arbitration clause in the national collective bargaining agreement is quite broad. It refers to "issue[s]" and "dispute[s]" concerning the "interpretation and application of the National Agreement" and dictates that, if not resolved, "either representative may submit the dispute to arbitration." (JE–1 at 47) Such language is certainly broad enough to encompass the wage and insurance dispute at issue.

Furthermore, Article VII of the national agreement contains an unconditional no-strike clause which forbids the union from striking and the company from locking out its employees. Such a clause is the *quid pro quo* for an arbitration clause, and its "inclusion lends support to the view that the collective bargaining agreement was intended to completely effectuate the federal policy of promoting industrial stabilization." *Bricklayers & Allied Crafts Union, Local No. 4 v. Associated General Contractors of Minnesota*, 711 F.2d 90, 91 (8th Cir.1983). *See also Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276, 279 (7th Cir.1981) ("The union's promise not to strike is generally regarded as the *quid pro quo* for the employer's agreement to submit grievance disputes to the process of arbitration.") The parties' failure to amend the no-strike clause during the 1987 national agreement negotiations to exempt union action in the event of failure to agree pursuant to the reopener also supports the conclusion that the parties intended to resolve disputes concerning the economic reopener pursuant to the grievance/arbitration procedure. If the parties had intended that the company would be permitted unilaterally to impose its last pre-impasse proposal pursuant to the economic reopener, it seems that they would have modified the no-strike clause to permit the union to

U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise*

*Wheel*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

strike should the parties be unable to reach agreement.[7]

The Eighth Circuit came to a similar conclusion in two recent cases which the court finds extremely persuasive. *General Drivers and Helpers Local 554 v. Mid–Continent Bottlers*, 767 F.2d 482 (8th Cir. 1985), *mod. in part, reh. denied*, 120 L.R.R.M. (BNA) 2336, *cert. denied*, 474 U.S. 947, 106 S.Ct. 346, 88 L.Ed.2d 293 (1986); *Bricklayers and Allied Crafts Union Local 4 v. Associated General Contractors*, 711 F.2d 90 (8th Cir.1983). In *General Drivers*, a union brought suit alleging that the employer had breached the collective bargaining agreement by unilaterally implementing a new compensation system after the parties had negotiated and reached impasse on this issue under an economic reopener. *Id.* at 484. The collective bargaining agreement included an arbitration clause that provided for negotiation and ultimate arbitration of any "controversy arising over the interpretation, or adherence to, the terms or provisions of the Agreement."

The collective bargaining agreement also provided for the reopening of portions of the agreement limited to "the issue of ... a change in the method of compensation...." Finally, the agreement prohibited all strikes and lockouts, except if the parties "are unable to negotiate an agreement during the reopener." *Id.* After the company notified the union that it was exercising the reopener, six months of negotiations, and the union's rejection of the company's final proposal, the parties reached impasse and the company unilaterally implemented its final offer.

The district court held that the company breached the contract by imposing a new compensation system that resulted in lower salaries for union members. The company appealed alleging that the dispute over whether the company could unilaterally change the wage system pursuant to the wage reopener was subject to the grievance and arbitration procedure. *Id.* at 485–486.

The Eighth Circuit Court of Appeals agreed with the company and reversed the district court ordering the union to take the dispute to arbitration. The court stated:

> Clearly, the contention of the company that a right existed under the contract unilaterally to implement its final offer to the union upon reaching impasse in reopener negotiations presented a controversy over interpretation of or adherence to the bargaining agreement within the arbitration clause.... The question posed by the company in this case, whether the Company could impose its final offer in response to impasse and make the Union decide whether to strike, is for the arbitrator.

*Id.* at 485.

In so holding, the court rejected the union's argument that the resolution of the dispute was beyond the power of any arbitrator because it required setting wages for jobs not described in the agreement. The court reasoned that the union's contention ignored "the question of whether the Company's unilateral action violates the agreement at all. Resolution of that question is committed by [the collective bargaining agreement] to arbitration. *Id.* See also, Bricklayers & Allied Crafts v. Assoc. of General Contractors*, 711 F.2d 90 (8th Cir.1983) (court held that whether an employer could unilaterally implement its final proposal after reaching impasse pursuant

---

7. Mr. Sosiak, Vice–President of Human Relations at Exide testified at the hearing that the company intended the economic reopener to mean that if agreement could not be reached under the reopener, the company would be able to implement its last pre-impasse proposal. Mr. Sosiak also stated that Exide never discussed this intention with the union. This testimony goes to the merits of the arbitration dispute upon which the court takes no position. It is not relevant to the threshold issue of whether the company may unilaterally change terms and conditions of employment pursuant to the reopener. *See Morristown Daily Record*, 832 F.2d at 35.

to an undefined wage reopener must be decided by an arbitrator).

The defendant argues that the grievances filed by the union resulting from the company's unilateral changes are not arbitrable because the company implemented its final proposal after reaching an impasse in negotiations under the economic reopener. However, the cases relied upon by defendant involve parties seeking to have an arbitrator establish the actual terms of a collective bargaining agreement and thus are inapposite. For example, defendant relies on a case in which an employer brought suit alleging that a union breached the collective bargaining agreement by striking over a wage dispute after attempting to negotiate wages under a wage reopener clause. The court dismissed the complaint for failure to state a claim finding that the union had no duty to arbitrate the actual terms of the collective bargaining agreement. *Best Cranes, Inc. v. International Union of Operating Engineers, Local 139*, 93 L.R.R.M. (BNA) 2994 (E.D.Wisc.1976). *See also, Lodge 802, International Brotherhood of Boilermakers v. Pennsylvania Ship Building Company*, 835 F.2d 1045 (3d Cir.1987) (court refused to compel arbitration of new terms and conditions of employment governing the loading and unloading of ships); *Montgomery Mailers Union No. 127 v. Advertiser Co.*, 827 F.2d 709 (11th Cir.1987) (court ordered arbitration to decide whether a letter sent by the company constituted a counter-proposal under the collective bargaining agreement, but refused to compel arbitration of the actual terms of a new collective bargaining agreement).

These cases stand for the proposition that courts ordinarily will not order "interest" arbitration, allowing an arbitrator to establish terms and conditions of employment, absent specific language in the contract providing for such arbitration. The union in this case, however, does not seek to have an arbitrator establish wages and insurance benefits. Instead, the union seeks a determination of whether the economic reopener permits Exide to unilaterally implement its last pre-impasse proposal; a determination which involves a question

of interpretation of the existing collective bargaining agreement.

The defendant also relies on section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), to argue that an employer who engages in good faith negotiations to impasse under an economic reopener may lawfully implement its final proposal governing these provisions in accordance with section 8(d). According to defendants, because the economic terms of the contract have been committed to an economic reopener they are beyond the scope of the arbitration clause, and the parties conduct pursuant to the reopener is governed by Section 8(d), the National Labor Relations Board and the courts.

Although defendant's position has surface appeal, I must reject it. The defendant can point to no direct and binding authority for its proposition that a company may unilaterally implement its last pre-impasse proposal pursuant to an economic reopener. Defendant relies on two unfair labor practice cases arising under section 8(d). *See Herman Brothers, Inc.*, 273 NLRB 124 (1984); *Kelly–Goodwin Hardwood Co.*, 269 NLRB 33 (1984).

However, neither of these decisions hold that a party may implement its last pre-impasse proposal under an economic reopener. Rather, in each case, two members of the National Labor Relations Board assert this proposition. *See Herman Brothers*, 273 NLRB at 124; *Kelly Goodwin*, 269 NLRB at 38 n. 25. Whether unilateral implementation of a company proposal is permitted under section 8(d) remains an open question as evidenced by a recent National Labor Relations Board decision in which the Board refused to decide whether an employer may unilaterally implement its last offer after an impasse in reopener negotiations. *Laporte Transit Co.*, 126 NLRB 1184, 1185 n. 2 (1987) ("Thus, for purposes of deciding this case, we find it unnecessary to decide, as a general proposition, whether the terms of the parties' reopener provision would permit unilateral changes if a good faith impasse had been reached"). *See also, Speedrack, Inc.*, No. 14–CA–19131, slip op. at 5 (N.L.R.B. April

15, 1988). (Administrative Law Judge held that an employer may not implement its last proposal after reaching impasse under a reopener).

Defendant also relies on a United States Supreme Court case dealing with a company's alleged unfair labor practices. *NLRB v. Lion Oil Co.*, 352 U.S. 282, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957). The collective bargaining agreement in *Lion Oil* provided that either party could seek mid-term modification of the contract by notifying the other party of its desire to reopen the contract. The union struck in support of its modification demands more than 60 days after it gave notice of its desire to modify the contract but before the expiration date of the contract. The union brought an unfair labor practice complaint against the company and the company defended on the ground that the strike was in violation of section 8(d) because it occurred prior to the expiration date of the contract. The Supreme Court rejected this defense agreeing with the Board's definition of "expiration date" as "connot[ing] not only the terminal date of a bargaining contract, but also an agreed date in the course of its existence when the parties can effect changes in its provisions." *Id.* 352 U.S. at 287, 77 S.Ct. at 333.

The company's reliance on *Lion Oil* and its argument that a contract reopener terminates the reopened terms which are then beyond the scope of arbitration fails to consider that the question of whether a party has violated its duty to bargain in good faith is separate from the question of whether a party has violated the collective bargaining agreement by refusing to arbitrate a dispute. The parties' obligation to bargain over mandatory subjects under the NLRA "does not determine the scope of permissible bargaining." *Teamsters Union Local No. 115 v. DeSoto, Inc.*, 725 F.2d 931, 937 (3d Cir.1984). "No rights arise under the [NLRA] if a party refuses to bargain over a non-mandatory subject, [however] there is [no] right under the statute to refuse to comply with a contract dealing with non-mandatory subjects that the parties have incorporated into the contract." *Id.* In other words, certain rights

arise under the NLRA and others arise under the collective bargaining agreement. Although the question of whether the negotiations between Exide and the UAW reached an impasse is a question for the NLRB, the question of whether the company may unilaterally change the terms of employment pursuant to the economic reopener is a question of contract interpretation for the arbitrator.

I must also reject the company's argument that the economic reopener is not subject to arbitration because it is an independent agreement separate from and only mentioned in the collective bargaining agreement. In support of this argument, the company relies on an Eighth and a Third Circuit case. *RCA Corp. v. Local 241, International Federal of Professional and Technical Engineers*, 700 F.2d 921 (3d Cir.1983) and *Printing Specialities, Local 680 v. Nabisco Brands*, 833 F.2d 102 (7th Cir.1987). This reliance is misplaced. The unions in both of these cases brought suit to compel employers to arbitrate decisions made by the pension committees which administered the employers' pension plan. In *RCA*, the union sought to arbitrate two unilateral changes to the pension plan involving an increase in interest rate assumptions and buy back interest rates made by the pension committee; while in *Printing Specialities*, the union sought to arbitrate grievances involving the pension committee's denial of early retirement benefits to two employees. Both collective bargaining agreements contained broad arbitration clauses and made passing references to the employee pension plans.

Both courts refused to order arbitration based on the pension plans holding that a simple reference to the pension plans in the collective bargaining agreements was insufficient to construe the plans as part and parcel of these agreements. In holding that the pension committees' decisions were not subject to arbitration, the courts stressed the independent nature of the pension plans as illustrated by the parties' separate negotiation of the collective bargaining agreements and the pension plans, the separate administration of the plans,

the companys' rejection of the unions' attempts to negotiate pension proposals during contract negotiations, the pension plans' coverage of both union and non-union members, and the separate appeal procedures provided by the plans and the collective bargaining agreements. *Printing Specialities*, 833 F.2d at 104–105; *RCA*, 700 F.2d at 927. The same cannot be said for the economic reopener and the collective bargaining agreement at issue here. The economic reopener cannot be separated from the collective bargaining agreement. First, both parties negotiated the economic reopener during their 1987 negotiation of the national bargaining agreement. As testified to by Mr. Sosiak, the parties agreed to the economic reopener, at least in part, because they could not agree on the remaining holidays or the cost of living adjustment. Second, the economic reopener serves to reopen portions of the national agreement for negotiation. In short, the court would be splitting hairs if it were to find the economic reopener of an agreement separate from the very agreement the reopener negotiations were to potentially modify.

In its final argument, the company contends that whether it may unilaterally change insurance carriers and benefits is not arbitrable because the General Insurance Agreement excludes from the grievance/arbitration procedure any "matter respecting the Group Insurance Program, or any difference arising thereunder...." The company, of course, is correct that a court cannot compel the arbitration of a dispute which the parties expressly exclude from arbitration. However, the union is not seeking to compel the company to arbitrate any "matter" or "difference" arising under the insurance agreement; nor does the union seek to arbitrate what benefits or carrier the company should provide. Rather, the union seeks to arbitrate the meaning of the economic reopener. In other words, the issue of whether the company may unilaterally change insurance carriers and benefits arises under the collective bargaining agreement, not the group insurance agreement.

In this case, it cannot be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covered the asserted dispute. Therefore, in light of the parties' broad arbitration clause, the overwhelming federal policy in favor of arbitration and because nothing in the collective bargaining agreement or the group insurance agreement can be construed to exclude it, the economic reopener dispute is arbitrable under the terms of the collective bargaining agreement and is properly left to an arbitrator.

### Order Enjoining Change in Health Insurance Carriers and Benefits

The Norris–LaGuardia Act, 29 U.S.C. sections 101–15 (1982), broadly prohibits federal court injunctions in labor disputes to prevent the federal courts from "interfering with economic struggles between employees and their employers." *Nursing Home*, 759 F.2d at 1098. The Supreme Court fashioned an exception to this broad prohibition where an injunction is necessary to further the federal policy of encouraging the voluntary settlement of disputes through the arbitration process. *See Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). Although the Court in *Boys Markets* upheld an order enjoining a union from striking pending the resolution of a dispute subject to arbitration, injunctions may in certain circumstances issue against acts taken by or threatened by an employer. *United Steelworkers of America, AFL–CIO v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1278 (3d Cir.1979). *See, e.g., Nursing Home*, 759 F.2d at 1098; *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276 (7th Cir.1981); *Drivers, Chauffeurs, Warehousemen and Helpers Local 71, etc. v. Akers Motors Lines, Co.*, 582 F.2d 1336 (4th Cir.1978) cert. denied, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979); *Lever Bros. Co. v. International Chemical Workers, Local 217*, 554 F.2d 115 (4th Cir.1976).

■ To determine whether such an injunction is appropriate, the court must examine: 1. whether the underlying dispute

is subject to mandatory arbitration, 2. whether the employer's actions in refusing to submit the dispute to arbitration is "frustrat[ing] the arbitral processes the parties have chosen," 3. and whether an injunction would be appropriate "under ordinary principles of equity"—probability of success on the merits, irreparable injury, and a balance of hardships. *Fort Pitt Casting*, 598 F.2d at 1278 (citations omitted); *Nursing Homes*, 759 F.2d at 1098. As the moving party, the union has the burden of proving these elements. *Lodge 802, International Brothers of Boilermakers AFL–CIO v. Sun Ship, Inc.*, 511 F.Supp. 347, 349 (E.D.Pa.1981).

 As discussed above, the dispute which precipitated this action, whether the company is permitted to unilaterally change health insurance carriers, wages, and medical benefits after reaching impasse under an economic reopener, is covered by the collective bargaining agreement's arbitration clause. This clause is quite broad and nothing in the collective bargaining agreement excludes this issue from the arbitration process.

The court also agrees with the union that the company's refusal to arbitrate this issue has interfered with and frustrated the arbitration process. Exide was obligated to arbitrate whether it could unilaterally change the above terms of employment when notified by the union that the union sought arbitration of this issue. Exide's refusal to arbitrate this issue and unilateral implementation of the above changes "ran counter to the congressional policy of promotion of the arbitral process as a substitute for economic warfare." *Fort Pitt Steel*, 598 F.2d at 1279, *quoting, United States Steel Corp. v. United Mine Workers*, 593 F.2d 201, 204 (3d Cir.1979).

Moreover, Exide's actions would render an arbitrator's award a "hollow formality" because "when rendered it could not return the parties substantially to the *status quo ante.*" *Fort Pitt Steel*, 598 F.2d at 1282, *quoting, Lever Bros.*, 554 F.2d at 123. It is for the arbitrator to decide whether the company could unilaterally change insurance carriers, wages, and medical benefits

after reaching impasse pursuant to the economic reopener. However, as more fully discussed below, if the company is permitted to drastically cut wages and medical insurance coverage for its employees pending arbitration, and some of its employees are unable to obtain medical care as a result of these cuts, an arbitrator's award finding in favor of the union would indeed be merely a hollow formality. *Fort Pitt Steel*, 598 F.2d at 1282.

Having found that the dispute at issue here is subject to the grievance and arbitration procedures provided for in the national agreement and that the company's actions, if not enjoined, will frustrate the arbitral process, the court must determine whether the union has made a sufficient showing that it will suffer irreparable harm if an injunction is not issued. "The critical issue facing [a] district court [is] whether the breach of the contractual agreement to arbitrate caused or threatened to cause irreparable injury to union members." *Fort Pitt Steel*, 598 F.2d at 1280.

The union argues that its members will suffer irreparable harm because they face a substantial risk of being denied adequate medical care resulting from the company's wholesale wage cuts and drastic reduction in health insurance coverage. (Plaintiff's reply brief at 10) The defendant counters that the union and its members will suffer no irreparable harm because any such harm can be remedied by an arbitrator's award of reimbursed medical expenses and backpay. Defendant emphasizes that any hardship suffered by the union would be short lived. (Defendant's pre-hearing memorandum in opposition to preliminary injunction at 13)

In *Fort Pitt Steel*, the Third Circuit affirmed the district court's issuance of a preliminary injunction restraining an employer from terminating premium payments pending the arbitration of whether the union need reimburse the employer for premiums paid while the workers were out on strike. The court reasoned that the fact that the payment of money was involved did not automatically preclude a finding of irreparable injury. The court held that the

union had made a sufficient showing of irreparable injury stating

> If the risk of "water pipes freezing" can constitute irreparable injury, *see Celotex Corp. v. Oil Workers*, 516 F.2d 242, 242 (3d Cir.1975), then surely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute "substantial and irreparable injury".

*Fort Pitt Steel*, 598 F.2d at 1280. *See also Schultz v. Teledyne, Inc.*, 657 F.Supp. 289, 293 (W.D.Pa.1987) ("The termination of health insurance benefits, particularly to those on a fixed income [is a] sufficient threat of irreparable harm to warrant the issuance of an injunction."); *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir.1979) ("[T]hreatened termination of benefits such as medical coverage for workers and their families obviously raised the specter of irreparable injury."); *UAW v. White Farm Equipment Co.*, 119 L.R.R.M. (BNA) 2878, 2883 (D.Minn.1984) [available on WEST-LAW, 1984 WL 4605].

Blue Cross/Blue Shield contracts with a large network of doctors and hospitals, who agree to provide Blue Cross/Blue Shield patients with reduced hospital and physician rates. The Blue Cross/Blue Shield plan is a non-contributory health insurance program which pays for covered procedures performed by participating physicians in full. The Connecticut General Plan, on the other hand, is a co-pay program, which requires an annual deductible payment of $200 for each individual, with a maximum deductible payment of $400 per family, before an individual can receive any payment for hospital, surgical or medical benefits. In addition, a co-payment of 35% is required of each individual or family until, in an individual's case, he or she has paid $5,000 out-of-pocket or, in a family's case, $10,000 for covered hospital, surgical, or medical services during the year. Under the Connecticut General plan, employees are billed directly by the hospital or physician and are indemnified later by Connecticut General. Therefore, plaintiff's members are threatened with a great reduction in their medical insurance benefits.

Plaintiff's members also have suffered a significant reduction in wages. Exide has cut wage rates by $4.35 per hour in Allentown, $1.00 per hour in Burlington, $2.00 per hour in Denver, and $2.75 per hour in Logansport.

I am convinced that irreparable harm exists in this case as a result of the drastic reduction in health insurance benefits and the wholesale wage cuts implemented by the company. A substantial risk exists that workers will forego necessary medical treatment or diagnosis because of their inability to pay their share of the costs. Mr. Robert Humanick testified that his wages were slashed by approximately $3.40 or 37% and that should he or a member of his family become ill, he would have only a "few hundred dollars to pay." Mr. Humanick also stated that a number of employees presently were afflicted with serious medical problems. Moreover, Mr. Robert Alpert, senior benefits consultant, stated that he has seen doctors and hospitals refuse to treat patients who were unable to pay for treatment in advance of the procedure. "It is a utopian notion that all working men and women ... can well afford ... the cost of essential medical services today or that, if they cannot afford them, that those services will always be provided to them.... The harsh reality is that persons on limited incomes who are not covered by some form of medical insurance often forego needed medical attention because of its prohibitive cost." *Mamula v. Satralloy, Inc.*, 578 F.Supp. 563, 577 (S.D.Ohio 1984) (court issued an injunction restraining an employer from refusing to make health insurance premium payments where some of the employees could not afford to purchase health insurance or could only afford to purchase limited insurance); *see also UAW v. White Farm Equipment Co.*, 119 L.R.R.M. (BNA) 2882.

The company's argument that this case can be distinguished from *Fort Pitt Steel* and the other cited cases because the workers in those cases faced a total termination of medical benefits, while the UAW workers face only a reduction in benefits is

without merit.[8] This argument ignores the substantial wage cuts imposed on the workers by Exide. Because of the financial constraints placed on the union members resulting from the wage cuts, the practical effect of the medical benefits reductions could well be to preclude employees from seeking medical treatment.

Nor is the union's inability to name a particular employee who has been denied medical treatment under the Connecticut General plan of any moment. Blue Cross/Blue Shield continued to pay UAW workers' benefits until Monday, May 9, 1988. Because Blue Cross/Blue Shield has only recently ceased paying these benefits,[9] no reason existed for employees to forego medical care. To refuse to issue an injunction until the union can present evidence that an employee has been seriously injured because he could not obtain medical care would be senseless. Moreover, the union need not produce evidence that its members actually have been harmed. A showing of threatened irreparable harm is also sufficient.

The company's argument that any harm suffered by the employees as a result of the reduction in health care benefits can be remedied by an arbitrator's award of reimbursed medical expenses should the union prove successful at the arbitration is also without merit. Such an argument simply ignores economic realities. This argument rests on the assumption that one who has inadequate medical insurance will nonetheless seek and obtain necessary medical care, will pay for the medical care received at the time, and will be reimbursed by the company should the union win its grievance. However, this argument falters when one realizes that the cost of medical hospitalization and other services is far beyond the reach of the average worker. "It is an unfortunate but true fact of life today that health care costs have skyrocketed to the point where health care insurance is virtually a necessity for persons of modest incomes if needed medical attention is to be obtained." *Mamula,* 578 F.Supp. at 577. The effects of delay in obtaining necessary medical treatment or of not receiving any medical attention because one does not have adequate medical insurance are incapable of being easily measured. This harm cannot be adequately compensated by an arbitrator's decision to award reimbursed medical expenses after an employee's condition has worsened because he or she could not afford medical care. *Id.*

■ Although the union has made a sufficient showing of irreparable harm to enjoin the company from changing health insurance carriers and from reducing health insurance benefits, it has not made a sufficient showing that its members will be irreparably harmed absent an order enjoining Exide from reducing wages. In this circuit, a reduction in wages or a loss of salary does not constitute irreparable harm because such a loss is easily compensable by money damages. *Morton v. Beyer,* 822 F.2d 364, 372 (3d Cir.1987); *see also In Re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137 (3d Cir.1982). Nor is a claim that one will be unable to purchase food and clothing or pay house and car loans sufficient to constitute irreparable harm. In *Morton,* the plaintiff claimed that his state prison employer violated his due process rights by suspending him without pay and without a proper hearing. Plaintiff sought an injunction requiring his employer to reinstate him immediately to active

---

**8.** Exide's reliance in support of this argument on *Lodge 802, International Brotherhood of Boilermakers v. Sun Ship, Inc.,* 511 F.Supp. 347 and *United Steelworkers of America v. Bethlehem Steel Corp.,* 519 F.Supp. 595 (D.Md.1981) is without merit. In *Sun Ship,* the court refused to find irreparable harm because there was absolutely no evidence that employees would be denied medical care. *Bethlehem Steel* is also distinguishable from the case at bar because the company was willing to take the dispute in that case to expedited arbitration and the court found that the employees could afford to pay the $400 necessary to insure their dependents should the company terminate the dependents' insurance.

**9.** Mr. Robert Humanick testified that Blue Cross/Blue Shield instructed the workers to use their Blue Cross benefit cards until they were turned away by a health care provider. He then testified that Blue Cross/Blue Shield notified the employees that the company would no longer process their claims "as of last Monday."

employment claiming that he suffered irreparable harm because he could no longer afford to pay his necessary living expenses. The Third Circuit reversed the district court's issuance of a preliminary injunction stating that although "we are not insensitive to the financial distress suffered by employees whose wages have been terminated, we do not believe that loss of income alone constitutes irreparable harm." *Id.* at 372.

Moreover, the UAW employees can be made whole by an arbitrator's award of backpay should the union succeed at the arbitration. Further, the substantial threat that the employees will be unable to obtain adequate medical care because the company has changed health insurance carriers and has reduced health insurance benefits is adequately addressed by my order enjoining Exide from changing health insurance carriers or benefits pending arbitration. Therefore, I must dissolve that part of my order dated May 17, 1988 which enjoined the company from reducing wages pending arbitration.

In dissolving that part of the May 17, 1988 injunction concerning wages, I am aware that I must reject the union's argument based on the recent Third Circuit case *UAW v. Mack Trucks, Inc.*, 820 F.2d 91 (3d Cir.1987). In *Mack Trucks*, a general insurance agreement prohibited the parties from unilaterally changing medical insurance carriers. Notwithstanding this clause, the *company changed insurance* carriers without securing the agreement of the union. Both parties agreed that the benefits provided by the two carriers were the same.

The union brought suit seeking a permanent injunction restraining the company from unilaterally changing insurance carriers. Although it was clear that the employer had violated the collective bargaining agreement, I denied the union's motion for a preliminary injunction reasoning that the union had failed to show irreparable harm because the benefits provided by the two carriers were identical. *Id.* at 92.

The Third Circuit reversed my denial of the union's motion for a preliminary injunc-

tion stating that "as a matter of the law the district court erred in holding that Mack's breach of the collective bargaining agreement has not harmed the Union." *Id.* at 95. The court found that by unilaterally changing insurance carriers when it had agreed not to do so without the agreement of the union, the company had deprived the union of a "valuable bargaining chip" and, thus, the union suffered irreparable harm. The court stated:

> Article I, section 2 of the collective bargaining agreement as amended requires the Union to agree to proposed terms and conditions before Mack is able to substitute another health insurance carrier for Blue Cross/Blue Shield. Nothing in that provision, however, empowers Mack to force the union to accede to "an alternative delivery system," even if its terms and conditions surpassed those which the union enjoined with Blue Cross/Blue Shield. The UAW thus possessed a bargaining chip which the union might trade for other benefits from Mack.

*Id.* at 95.

Unlike *Mack Trucks* in which it was clear that the company had breached the insurance agreement, whether the company breached the collective bargaining agreement or the general insurance agreement by taking unilateral action pursuant to the economic reopener is not clear. In fact, this is the very question which the union desires to be arbitrated. In essence, the present position of the parties in this case is a step before *Mack Trucks*. Should the arbitrator find for the company, then the company has not breached the collective bargaining agreement or the general insurance agreement and we never reach the question of irreparable harm. On the other hand, should the arbitrator find for the union, then the company will have breached both agreements by unilaterally changing wages, insurance carriers and insurance benefits without the consent of the union. Because it is not yet clear whether the company's unilateral action breached the collective bargaining agreement or the general insurance agreement and, therefore,

whether the union has lost a "bargaining chip," I am unprepared to hold that the union has shown irreparable harm based on *Mack Trucks.*

Although not expressly argued by the union, one could also contend that the company breached the collective bargaining agreement's arbitration clause by refusing to arbitrate an issue which has now been held to be arbitrable. This argument is equally without merit. If such were the case, then the court would have to find irreparable harm in the form of a lost bargaining chip in every suit in which an employer or union sought an order compelling arbitration and maintaining the *status quo* pending that arbitration. There would no longer be a need for the moving party to show irreparable harm independent from the non-moving party's refusal to arbitrate and injunctions would automatically issue. Such a result would fly directly in the face of the longstanding requirement that a party seeking an injunction pending arbitration must show that such an injunction would be appropriate under ordinary principles of equity. *See Boys Markets,* 398 U.S. at 254, 90 S.Ct. at 1594; *Nursing Home,* 759 F.2d at 1098; *Fort Pitt Steel,* 598 F.Supp. at 1279. Therefore, I decline to extend *Mack Trucks* to a situation in which the question of whether the company has violated the contract is the very issue being sent to arbitration.

The two prerequisites for preliminary injunctive relief remaining for discussion are success on the merits and balancing of the equities. Neither party devotes much time to these issues. The union's burden of showing probable success on the merits is not great. To obtain an injunction maintaining the status quo the union need only show that the position it will argue in arbitration is "sufficiently sound to prevent the arbitration from being a futile endeavor." *Nursing Home,* 759 F.2d at 1098 n. 3, *quoting, Panoramic Corp.,* 668 F.2d at 284–85. "If there is a genuine dispute with respect to an arbitrable issue, the barrier [to the issuance of an injunction] we believe appropriate[ly sic] has been cleared." *Panoramic,* 668 F.2d at 285. Plaintiff has made a satisfactory showing that it will be

successful on the merits so long as its position is not "frivolous." *Id.* Any higher burden would "intrude significantly on the arbitrator's function and would constitute the sort of judicial preemption of the arbitral process condemned" by the Supreme Court. *Id. See Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

I conclude that the union's claim that the economic reopener language does not permit the company to unilaterally change insurance carriers, insurance benefits and wages sufficiently raises a "genuine" dispute to support a preliminary injunction. With respect to the health insurance changes, the general insurance agreement clearly provides that the company shall make no changes in insurance carriers absent mutual agreement of the parties. Nor is there anything in the economic reopener language which permits the company to unilaterally change wages, insurance carriers or insurance benefits. Moreover, the company's argument that the union has not shown a probable success on the merits is a reiteration of its argument that the dispute at issue here is not arbitrable. According to the company, an arbitrator would have no jurisdiction to decide these issues because action taken pursuant to an economic reopener after impasse is governed by section 8(d) of the National Labor Relations Act. I must reject this contention for the same reasons discussed above in support of my conclusion that the economic reopener issue is subject to arbitration.

Finally, defendants argue that a preliminary injunction should not issue because the balance of the harms that the parties will suffer weighs in its favor. According to the defendant, it will be put to great expense if it must convert its coverage from Connecticut General back to Blue Cross/Blue Shield. However, any harm which defendant may suffer resulting from the issuance of this preliminary injunction is limited to that of money damages. Conversion back to Blue Cross/Blue Shield will only involve the payment of insurance premiums pending the disposition of the arbitration, which the parties have been in-

structed to hold as expeditiously as possible. Further, it appears that this task will not be terribly onerous administratively as Blue Cross/Blue Shield has only recently discontinued honoring the claims of plaintiff's members. The harm to the plaintiff, on the other hand, is the potential lack of adequate medical care and resulting risk to its members' health. In balancing the relative harms to the parties, plaintiff and its members are in greater jeopardy than is defendant.[10]

## CONCLUSIONS OF LAW

1. I have jurisdiction over this dispute pursuant to section 301 of the National Labor Relations Act, 29 U.S.C. § 185.

2. The issue of whether defendant Exide may unilaterally change medical insurance carriers, medical insurance benefits and wages is arbitrable under the national collective bargaining agreement.

3. Plaintiff UAW and its members will suffer irreparable harm if an injunction does not issue restraining defendant Exide from changing medical insurance carriers and from reducing medical insurance benefits.

4. Plaintiff UAW has failed to show that it will suffer irreparable harm if an injunction restraining defendant Exide from reducing wages does not issue.

5. Plaintiff has shown that the position it will argue in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor.

6. The equities favor the plaintiff.

7. The public interest is served by issuing this injunction.

---

10. Although not mentioned by either party, the court also finds that the public interest would best be served by the issuance of a preliminary injunction. The public interest is consistent with the preservation of employee health insurance benefits bargained for and agreed to by a union and an employer.