919 F.Supp. 783 (1996)
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICAN, UAW, and its Local Union No. 787, Plaintiff,
v.
TEXTRON LYCOMING RECIPROCATING ENGINE DIVISION, AVCO CORPORATION, a/k/a Textron Avco Corporation, Defendant.
No. 4:CV-96-0449.
United States District Court, M.D. Pennsylvania.
March 28, 1996.
*784 *785 William T. Josem, Cleary & Josem, Philadelphia, PA, for plaintiff.
Barry Simon, Schnader Harrison Segal & Lewis, Philadelphia, PA, Charles J. McKelvey, Williamsport, PA, for defendant.

MEMORANDUM
McCLURE, District Judge.

BACKGROUND:
Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of American and its Local Union No. 787 (hereafter collectively, the union) bring this action under section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185. This action was filed against Textron Lycoming Reciprocating Engine Division and Avco Corporation (hereafter Textron) on March 15, 1996.
The union is challenging a proposed change in the health care plan available to Textron retirees. Coverage is currently provided by Blue Cross/Blue Shield of Northeastern Pennsylvania. Under the Blue Cross/Blue Shield plan currently in effect, retirees may seek medical treatment from a physician or hospital of their own choosing and seek reimbursement for the costs incurred, or in some cases, a percentage of the same, from Blue Cross/Blue Shield.
Textron proposes to change the retirees' coverage to another plan also sponsored by Blue Cross/Blue Shield known as First Priority 65 which operates as a health maintenance organization or HMO. All retirees and their dependents who are Medicare eligible (Parts A or B) and who reside in Lycoming, Luzerne or Lackawanna Counties at least nine months of each year are required to switch to the new plan effective April 1, 1996.
Under First Priority 65, plan participants would be required to choose a primary care physician who is a member of its network of care providers and utilize that physician's services for their medical needs. Referrals to a specialist within the network of First Priority physicians and hospitals would be made by and through the participant's primary *786 care physician. Participants retain the option of going to a physician of their own choosing outside the network, but would not be reimbursed for any costs incurred in doing so.
Through the union, Textron retirees have brought this action seeking to bar implementation of the proposed change in Blue Cross/Blue Shield plans. The union seeks a preliminary injunction barring the proposed change until the matter can be arbitrated to a final decision. The union filed a grievance challenging the proposed change in plans as a violation of the collective bargaining agreement currently in effect. The union's grievance was denied by Textron, and arbitration of that issue is now being pursued.
Textron challenges the union's right to bring this action on behalf of retirees or to obtain the relief sought on legal as well as factual grounds. Textron asserts that: 1) the union lacks standing to bring this action on behalf of retirees, whom it no longer represents as a collective bargaining agent; 2) any injunction issued by this court granting the relief sought by plaintiff would violate the Norris-LaGuardia Act (NLA), 29 U.S.C. §§ 101-115; and 3) plaintiff has not established the prerequisites necessary to obtain a preliminary injunction.
A hearing on plaintiff's request for a preliminary injunction was held on March 25, 1996. Based on the evidence of record and the parties' submissions, the court finds that: 1) the union has standing to pursue the claims alleged on behalf of non-salaried Textron retirees and their dependents affected by the proposed change to First Priority 65; 2) this court has authority under LMRA to issue injunctive relief; and 3) the union is not entitled to the injunctive relief which it seeks. An order will be issued directing that the dispute between the parties be submitted to binding arbitration.

DISCUSSION

Standing
Textron challenges the union's standing to represent the interests of retirees in this matter. The union concedes that it does not have standing to represent one segment of the retirees affected by the proposed change in carriers. It concedes that it has no standing to represent the interests of salaried employees. Salaried employees never belonged to the union.
Plaintiff asserts that its right to bring an action of this nature to enforce rights held by retirees under a collective bargaining agreement was recognized by the United States Supreme Court in Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Company, 404 U.S. 157 n. 20, 92 S.Ct. 383 n. 20, 30 L.Ed.2d 341 (1971). We disagree with plaintiff's interpretation of Allied. Plaintiff's argument misconstrues the Court's statement and ignores the preceding paragraph which states:
Since retirees are not members of the bargaining unit, the bargaining agent is under no statutory duty to represent them in negotiating with the employer. Nothing in Railroad Trainmen v. Howard, 343 U.S. 768 [72 S.Ct. 1022, 96 L.Ed. 1283] ... (1952), is to the contrary.... [Howard] obviously does not require a union affirmatively to represent nonbargaining unit members or to take into account their interests in making bona fide economic decisions in behalf of those whom it does represent.
This does not mean that when a union bargains for retirees  which nothing in this opinion precludes if the employer agrees  the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent....
Id. Only with this preface does the Court then state: "The retiree, moreover, would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed." We do not give this sentence the same weight or import as the union does. What the Court states, read literally, is that the retiree, not the union, as plaintiff contends, has a federal remedy under section 301.
Were this the only support for plaintiff's assertion of standing, we would be hard pressed to rule in its favor on this point. Plaintiff, however, also directs the court's *787 attention to Third Circuit precedent which supports its argument more directly.
In United Steelworkers of America v. Canron, Inc., 580 F.2d 77 (3d Cir.1978), the Third Circuit rejected the contention that the United Steelworkers of America, the union which filed the action, did not have standing to sue on behalf of retirees "because a union is precluded from representing `any individual who has ceased to work without expectation of further employment.'" Id. at 80. After discussing the Supreme Court's holding in Allied Chemical, the court held that the union had "standing to represent the retirees in seeking arbitration under its labor contract with Canron." Id. at 81.
Although defendant argues that Canron, is distinguishable on its facts, we are not convinced. Here, the union negotiated for and obtained for Textron retirees the medical benefits package currently at issue. It would seem only logical under Canron that the union would then have standing to sue to compel arbitration of an alleged breach of that agreement and to seek injunctive relief barring Textron from altering the status quo until the issue can be arbitrated.[1]

Norris-LaGuardia Act
Textron argues that the Norris-LaGuardia Act (NLA), 29 U.S.C. §§ 101-115, prohibits this court from issuing an injunction granting the relief sought by the union. The Norris-LaGuardia Act contains a broad prohibition against the issuance of injunctions by federal courts in labor disputes to prevent the courts from becoming embroiled in or "interfering with economic struggles between employees and their employers." Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc., 759 F.2d 1094, 1098 (3d Cir.1985).
Section 1 of the NLA provides:
No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.
29 U.S.C. § 101.
Section 4(c) of the NLA provides:
No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute ... from doing, whether singly or in concert, any of the following acts:
* * * * * *
(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value ...
29 U.S.C. § 104.
Citing the Third Circuit's decision in United Steelworkers of America v. Fort Pitt Steel Casting, 598 F.2d 1273, 1278 (3d Cir.1979), the union argues that the relief sought here falls within the exception to the NLA carved out by the Supreme Court in Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).[2] Under Boys Markets, courts may *788 consider the propriety of an injunction if necessary to preserve the integrity of the arbitral process. Textron argues that the Boys Markets exception does not apply here.
The Third Circuit endorsed a threepart test in Fort Pitt for determining whether the NLA precludes issuance of an injunction. In making that determination, federal courts should consider: 1) "whether the underlying dispute is subject to mandatory arbitration;" 2) "whether the employer, rather than seeking arbitration of his grievance, is `interfer[ing] with and frustrat[ing] the arbitral processes' ... which the parties had chosen;" and 3) "whether an injunction would be appropriate `under ordinary principles of equity.'" Id. at 1278-79. See also: Nursing Home, 759 F.2d at 1097.

Arbitrability of the underlying dispute
"A party cannot be compelled to submit a dispute to arbitration unless he has contractually agreed to do so." International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Exide Corporation, 688 F.Supp. 174 (E.D.Pa.1988), citing AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); Morristown Daily Record v. Graphic Communications Union Local 8N, 832 F.2d 31, 33 (3d Cir.1987); and E.M. Diagnostic v. Local 169, 812 F.2d 91, 94 (3d Cir.1987).
Whether a party has agreed "to arbitrate is a matter of contract construction and whether a dispute is arbitrable is a question of law for the court." Morristown Daily Record, 832 F.2d at 33. See also: Nursing Home, 759 F.2d at 1097.
The United States Supreme Court announced the standard in a section 301 action for deciding the parties' rights and obligations to arbitrate disputes under a collective bargaining agreement in United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), stating:
The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.... [T]he moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.
Id. at 567-68, 80 S.Ct. at 1346-47.
Consistent with the strong federal policy favoring arbitration of labor disputes, the courts apply what equates to a strong "presumption in favor of arbitrability which should only be dispelled when the agreement explicitly exempts certain conduct ... or when the terms of the agreement, read as a whole, clearly envision nonarbitrability." Controlled Sanitation Corp. v. District 128, International Assoc. of Machinists and Aerospace Workers, 524 F.2d 1324, 1328 (3d Cir.1975), cert. denied, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976). See also: Morristown Daily Record, 832 F.2d at 34. Generally, the courts will find that the dispute is arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.... In the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail...." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-85, 80 S.Ct. 1347, 1352-55, 4 L.Ed.2d 1409 (1960). See also: Nursing Home, 759 F.2d at 1097.
The collective bargaining dispute which precipitated this action is whether Textron is permitted consistent with the agreement to change health insurance plans applicable to retirees. The agreement's arbitration clause includes within its scope "any alleged violation of the terms of this Agreement or differences of opinion as to its interpretation or application." Agreement, Article III, section *789 1. Nothing in the agreement excludes from the arbitration process disputes such as the one here presented.
In view of the presumption in favor of arbitrability and the broad language of the arbitration clause in the union's agreement, we find that the dispute at issue here is subject to arbitration.

Harm or frustration to the arbitral process
Textron has delayed the submission of this matter to binding arbitration and has in that sense thwarted the arbitral process, the object of which is the prompt resolution of collective bargaining disputes without resort to judicial process. To rectify that problem, this court will issue an order: 1) directing that Textron reduce to writing within five business days from the date of this order its denial of the union grievance and state the reasons for the denial; and 2) directing that the parties submit this dispute to binding arbitration no later than fifteen business days from the date of this order.

Standards for relief under ordinary principles of equity
In deciding whether an injunction should issue, the court "must carefully weigh four factors:" 1) whether the movant has demonstrated a reasonable probability of success on the merits; 2) whether the movant will suffer irreparable injury if the injunction does not issue; 3) whether granting the injunction will result in "even greater harm to the nonmoving party;" and 4) whether granting the injunction serves the public interest. Gerardi v. Pelullo, 16 F.3d 1363, 1373 (3d Cir.1994). As the party seeking injunctive relief, the plaintiff bears the burden of proof on each of these four elements. American Telephone and Telegraph Company v. Winback and Conserve Program, 42 F.3d 1421, 1427 (3d Cir.1994).
Irreparable harm and likelihood of success on the merits are essential elements. Absent a showing of either one, the petitioner is not entitled to injunctive relief. The Third Circuit stated in Fort Pitt: "The critical issue facing the district court was whether breaches of the contractual agreement to arbitrate caused or threatened to cause irreparable injury to Union members." Id. at 1280.
To prove irreparable harm, the petitioner must show that the harm threatened by the defendant's conduct cannot be compensated by money damages. If the threatened harm is compensable with monetary damages, the petitioner has not demonstrated irreparable harm and is not entitled to a preliminary injunction. Frank's GMC Truck Center, Inc. v. G.M.C., 847 F.2d 100, 102-03 (3d Cir.1988).

Plaintiff's showing of irreparable harm
"The relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1264 (3d Cir.1985). We are not persuaded that that is true here. We do not find that retirees who will be transferred into First Priority 65 as of April 1, 1996 will suffer irreparable harm in the legal sense if their transfer to the new plan is not enjoined.
No retiree will be denied access to medical care. First Priority changes only: 1) the manner in which health care services are provided, i.e. through a "gatekeeper" primary care physician whose approval is necessary for referrals to another physician; and 2) the manner of payment, i.e. what portion of the bill is the responsibility of the participant. In most cases, a retiree will pay less, not more, for health care provided under the new plan. No individual will go without medical care if the change is implemented. Cf. Golden v. Kelsey-Hayes Co.
First Priority 65 has a broad network of participating physicians and hospitals in this area. Many participants will be able to continue seeing their current physician. Some participants will be required to change primary care physicians. Participants who are presently seeing specialists can continue under their care so long as: 1) the specialist is a member of First Priority 65; and 2) they receive a referral from their primary care physician.
*790 All retirees have the option of continuing to see their current physician if he or she does not participate in First Priority 65 and shouldering the cost themselves.
Finally, in the event that it is determined in arbitration that Textron's interpretation of the agreement is wrong and that the change in health care plans is not permitted, all participants will be transferred back to the current plan and will be treated as if there had never been an interruption in their coverage. There will be no gaps in coverage between cessation of the First Priority Plan and reactivation of coverage under the current plan. If that should occur and any retiree or a dependent has expended more money than he or she would have spent for the same care under the current plan, all such costs will be reimbursed by Textron. That was the representation made by Textron at the hearing held March 25, 1996, and as such, will be included in the court's order and deemed to give retirees an enforceable right to the same.

Likelihood of success on the merits
To establish a likelihood of success on the merits, the union must establish: 1) that the dispute is arbitrable; and 2) that its interpretation of the collective bargaining is correct and that the proposed change in plans is contrary to Article XIII, section 7 of the agreement. We are convinced of the first prong, but do not reach the second for the reasons explained below.
In view of the plain arbitrability of this matter, it seems inappropriate for this court to voice an opinion on the contractual dispute at the heart of this matter. The courts are firm in their agreement that once a matter is determined to be arbitrable, the court should proceed no further and should refrain from analyzing the case on the merits. Because it is clear on other grounds, i.e. the absence of a showing of irreparable harm, that the union is not entitled to the injunctive relief which it seeks, we do not reach the question of which party's interpretation of Article XIII, section 7 is correct. Such a finding is unnecessary under the circumstances, and would represent an unwarranted infringement on the sole authority of the arbitrator to decide the merits of the parties' collective bargaining agreement dispute. See: American Manufacturing Co., 363 U.S. at 567-68, 80 S.Ct. at 1346-47.

Maintenance of the status quo
Although denying the injunction will not preserve the status quo, we find that the absence of a showing of irreparable harm outweighs that consideration.

Balancing of the equities
A balancing of the equities does not support issuance of the injunction. If an injunction were to issue, Textron would be compelled to expend an additional $150,000.00 per month to maintain coverage under the Blue Cross plan currently in effect. It is this court's understanding, based on statements made at the March 25, 1996 hearing, that the union is reluctant to post a bond in advance for that amount for each month the current plan remains in effect until there is a final decision from the arbitrators. Without an adequate bond, Textron would, therefore, suffer the potential loss of those monies if compelled to continue coverage under the current plan. If the court had found irreparable harm to the union and/or retirees it formerly represented, a substantial bond would be required.
On the other hand, if Textron is permitted to transfer coverage to First Priority 65, the retirees will suffer no substantial loss. Although this court in no way intends to minimize the importance of choosing one's own physician or the disruption that a shift in care-providers may cause in the lives of plan participants, the evidence before the court leads us to conclude that: 1) due to the number of physicians and hospitals in this area who participate in First Priority 65, the number of retirees and dependents who will be compelled to switch physicians is not large; 2) those participants who are currently under the care of a non-participating physician or hospital for a serious condition or unusual ailment can seek and may receive permission from Textron to retain coverage under the current plan, as others have done successfully. These factors operate to ameliorate any detrimental impact on the union's constituency at large. Most retirees will not be detrimentally affected by the transfer either *791 financially or medically. No individual will have his or her health care threatened or health placed at risk by the switch.

FINDINGS OF FACT:
Based on the evidence introduced at the March 25, 1996 hearing, the court makes the following findings of fact:
1. The International Union, United Automobile, Aerospace and Agricultural Implement Workers of American and its Local Union No. 787 (hereafter the union) is a labor organization representing employees in the automotive industry and allied industries, with offices at 656 Lloyd Street, Williamsport, Pennsylvania.
2. Textron Lycoming Reciprocating Engine Division and Avco Corporation (hereafter Textron) is a Pennsylvania corporation with offices at 652 Oliver Street, Williamsport, Pennsylvania.
3. Textron operates a manufacturing facility in Williamsport at which it manufactures reciprocating engines.
4. The union represents non-salaried employees of Textron and has entered into a collective bargaining agreement (agreement) with Textron.
5. The agreement currently in effect will expire on April 4, 1997.
6. Article XIII, Section 7 of the agreement confers certain rights on retirees of Textron.
7. Article XIII, Section 7 provides that individuals who retired from Textron prior to October 1, 1990, and their dependents, have the right to receive "the same level of medical benefits that was in effect at the time of their retirement (or at the time their dependent/s became eligible for such coverage)."
8. Article XIII, Section 7 provides that individuals who retired from Textron after October 1, 1990, and their dependents, have the right to receive "the same benefits as the Comprehensive Medical Care Plan for active employees."
9. Textron currently provides medical coverage for retirees through a plan sponsored by Blue Cross/Blue Shield of Northeastern Pennsylvania.
10. Under the current plan, retirees may seek medical treatment from a physician or hospital of their own choosing and seek reimbursement for the costs incurred, or in some cases, a percentage of the same, from Blue Cross/Blue Shield.
11. Individuals who retired prior to October 1, 1990 receive medical benefits under the current plan, which has a lifetime major medical cap of $25,000.00, a deductible of $120.00 per participant, and 80%/20% co-insurance.
12. Individuals who retired after October 1, 1990 receive medical benefits under the current plan, which has a lifetime major medical cap of $1,000,000.00.
13. First Priority 65 is a Medicare health care maintenance plan (HMO) sponsored and run by Northeastern Pennsylvania, an affiliate of Blue Cross of Northeastern Pennsylvania.
14. First Priority 65 is available only to persons who are eligible for Medicare benefits (Part A or Part B).
15. Textron will transfer all persons eligible for coverage under First Priority 65 to coverage under that plan effective April 1, 1996.
16. Textron has agreed to make certain exceptions from the transfer to First Priority 65 on a case-by-case basis.
17. Textron has allowed certain individuals currently receiving on-going treatment for a serious or unusual ailment to continue coverage under Blue Cross/Blue Shield so that those individuals may continue to receive reimbursed treatment from their current health care provider.
18. A total of 1,336 Textron retirees covered under the current Blue Cross/Blue Shield plan qualify for coverage under First Priority 65. Of that number, approximately 200 are retirees from salaried positions and their dependents. The union does not have standing to protest the transfer of coverage for those individuals, and they are not considered part of this case.
19. Of the 1,080 retirees remaining in the affected group, approximately 990 individuals retired prior to October 1, 1990. Those individuals *792 are subject to the $25,000.00 lifetime cap for major medical expenses under their current plan.
20. First Priority 65 is a managed care plan under which each participating retiree or covered dependent selects a primary care physician who then acts as a "gatekeeper" for all medical services. If a medical problem arises, treatment must be sought first from the primary care physician. If the patient's condition warrants, a referral is made to a specialist within the network of physicians and medical centers who have contracted to provide services to First Priority 65 participants.
21. Health care will be available to participants who require medical treatment while traveling outside the First Priority 65 coverage area. At the present time, the coverage area is limited to three counties in northeastern Pennsylvania, Lycoming, Luzerne and Lackawanna. There are plans to add Clinton County, Pennsylvania to the coverage area in the not-too-distant future.
22. All hospitals in Lycoming County are First Priority 65 participants.
23. Geisinger Medical Center, located in Danville, Pennsylvania, is not a First Priority 65 participant.
24. First Priority 65 and the current plan have different financial arrangements for participants.
25. First Priority 65 has no cap on major medical expenses. The amount of the co-payment due from the participant for prescription drugs, medical treatment and other services differs from that charged under the current plan, and is in most instances, less. Deductibles are eliminated under First Priority 65.
26. If enrolled in First Priority 65, retirees currently under the care of a physician who is not a member of the First Priority 65 network will have to either switch physicians or pay themselves the cost of medical care received from non-participating physicians.
27. Many area general practitioners, specialists and medical centers participate in First Priority 65.
28. Only two full-time primary care physicians who practice in Lycoming County are not members of the First Priority 65 network. All other such physicians have made contractual arrangements to care for patients under the First Priority 65 plan.
29. Switching to coverage under the First Priority 65 plan will result in a savings to Textron of approximately $150,000.00 per month, reducing the cost of providing health care benefits to retirees from approximately $250,000.00 per month to $100,000.00 per month.
30. No retiree will be denied medical care if the proposed change in plans is allowed to go forward.

CONCLUSIONS OF LAW:
Based on the evidence introduced at the March 25, 1996 hearing, the court makes the conclusions of law:
1. The union is a labor organization representing employees in an industry affecting commerce within the meaning of section 2(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(5).
2. This court has jurisdiction under section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185, to consider the request for injunctive relief filed by the union.
3. The union has standing to represent the interests of non-salaried retirees of Textron whose health insurance coverage will be affected by the proposed change in Blue Cross/Blue Shield plans.
4. The union does not have standing to represent the interests of retirees from salaried positions at Textron. The interests of those retirees are not at issue in this matter, and those individuals are not parties to this case.
5. The underlying dispute over the proposed change in health care plans is subject to mandatory arbitration under Article III, section 1 of the collective bargaining agreement.
6. Textron has frustrated the arbitral process to some degree by failing to issue in writing its denial of the union's *793 grievance on the proposed change in health care coverage for retirees and in failing to agree to submit the issue promptly to binding arbitration.
7. The union is entitled to an order directing Textron to reduce to writing its denial of the grievance and the reasons therefor and further directing Textron to submit the dispute to binding arbitration.
8. The union has not established that it is entitled to injunctive relief barring implementation of coverage under First Priority 65 effective April 1, 1996.
9. There has been no showing that retirees affected by the transfer will suffer irreparable harm in the legal sense if the transfer in coverage goes forward.
10. The underlying dispute as to whether the proposed transfer of coverage for retirees to the First Priority 65 plan is arbitrable.
11. It would be inappropriate to consider the parties' collective bargaining dispute on the merits, in view of the plain arbitrability of that matter.
12. Denying the injunction will not preserve the status quo.
13. A balancing of the equities does not support issuance of an injunction barring the implementation coverage under First Priority 65.
14. As the case is being referred to binding arbitration, this court will no longer have jurisdiction over the underlying dispute.

* * *
An order will issue consistent with this memorandum.

ORDER
For the reasons stated in the accompanying memorandum, IT IS ORDERED THAT:
1. Plaintiff's motion for a preliminary injunction barring implementation of coverage for retirees under First Priority 65 is denied.
2. Textron is hereby directed to:
a) reduce to writing within five business days from the date of this order its denial of the union grievance and state in its denial the reasons therefor; and
b) submit this dispute to binding arbitration no later than fifteen business days from the date of this order.
3. The Clerk of Court is directed to fax a copy of the order only to all counsel today.
4. The Clerk of Court is directed to close this case file.
NOTES
[1] Compare Golden v. Kelsey-Hayes Co., 845 F.Supp. 410 (E.D.Mich.1994), aff'd, 73 F.3d 648 (6th Cir.1996), in which the retired employees and their dependents affected by a proposed change in health care coverage filed a class action against the employer to halt the proposed change.
[2] There is some disagreement among the federal courts as to the impact on Boys Markets of the Supreme Court's decision in Buffalo Forge Co. v. United Steelworkers of America, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). Some courts have interpreted Buffalo Forge as reversing Boys Markets in part or limiting its holding. See, e.g., Consolidated Rail Corp. v. Brotherhood of Maintenance of Way Employees, 847 F.Supp. 1294 (E.D.Pa.1994); Complete Auto Transit, Inc. v. Chauffeurs, Teamsters and Helpers Local Union No. 414, International Brotherhood of Teamsters, 839 F.Supp. 1339 (N.D.Ind.1993); and Teachers Association of Japanese Educational Institute of New York, Inc. v. Japanese Educational Institute of New York, 724 F.Supp. 188 (S.D.N.Y.1989). Other courts have resisted that interpretation. See, e.g., Local Lodge 1266 v. Panoramic Corp., 668 F.2d 276, 283 (7th Cir.1981).

For our purposes, this dispute need not be resolved. Any limitation on the Boys Markets holding imposed by Buffalo Forge is not inconsistent with the result which we ultimately reach here.